# Illinois Official Reports

## Appellate Court

---

### *FLM Enterprises, LLC v. Peoria County Zoning Board of Appeals*, 2020 IL App (3d) 180634

---

| | |
|---|---|
| Appellate Court Caption | FLM ENTERPRISES, LLC, Plaintiff-Appellant, v. THE PEORIA COUNTY ZONING BOARD OF APPEALS, Defendant-Appellee (The City of Chillicothe, an Illinois Municipal Corporation, Intervenor-Appellee). |
| District & No. | Third District<br>No. 3-18-0634 |
| Filed | January 29, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 16-MR-824; the Hon. James A. Mack, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Christopher J. Spanos, of Westervelt, Johnson, Nicoll & Keller, LLC, of Peoria, for appellant.<br><br>Jerry Brady, State's Attorney (Melinda L. Mannlein, Assistant State's Attorney, of counsel), and Danny L. Schroeder, of Hasselberg, Rock, Bell & Kuppler, LLP, both of Peoria, for appellees. |

PRESIDING JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justices McDade and Wright concurred in the judgment and opinion.


**OPINION**

¶ 1     Plaintiff, FLM Enterprises, LLC (FLM), filed a complaint seeking administrative review of the decision of the Peoria County Zoning Board of Appeals (Zoning Board) approving the Peoria County Department of Planning and Zoning's (Department) decision to revoke a nonconforming use certificate. The circuit court confirmed the board's decision, and FLM appeals. We reverse the order of the circuit court and remand to the Zoning Board for further proceedings.

¶ 2                              I. BACKGROUND

¶ 3     In 2007, FLM purchased an 80-acre tract of land near Chillicothe for the purpose of mineral extraction. In the months leading up to the purchase, FLM contacted the Department and inquired as to the validity of a nonconforming use certificate issued in 1974 that allowed mining and extraction of sand and gravel on the property. The Department confirmed that the certificate was still valid and issued a letter to FLM stating the same. FLM purchased the property and made improvements to its processing facility in anticipation of additional mineral supplies.

¶ 4     In 2016, FLM received notification from the Department revoking the nonconforming use certificate "due to evidence that the covered uses were abandoned for approximately 10 years" and ordering FLM to cease and desist. FLM appealed the Department's decision to the Zoning Board. In its appeal, FLM claimed that the nonconforming use had not been abandoned and, in the alternative, that the equitable remedies of estoppel and *laches* barred the Department from revoking the certificate.

¶ 5     Evidence presented at the Zoning Board hearing revealed the following facts. On September 10, 1974, the Department issued a nonconforming use certificate to Martin Marietta allowing mining activity on 22 parcels that comprised approximately 1057 acres along Truitt Road. The certificate allowed Martin to "strip and remove overburden, mine, quarry, extract, process, store, sell, remove and transport across, stone, sand and gravel in, on, under or from the properties," on all 22 parcels, including an 80-acre tract of land on the south side of Truitt Road. In the 1970's, Marietta dug a large test hole on the 80-acre parcel, leaving a stockpile of material that covered two to three acres, a significant portion of which remains on the property today.

¶ 6     On March 25, 1983, Marietta sold the property to Area Growth Corporation (AGC), a subsidiary of Chillicothe Savings and Loan. AGC did not engage in any mining activities on the property. In May 1984, while the property was still owned by AGC, a local church petitioned the Department for a special use permit. Their application, as well as the Department's staff report, identified the present land use as "agricultural."

¶ 7     On January 27, 1993, while the property was still owned by AGC, James and Dian Steeg and John and Janice Scott filed a petition for special use, requesting to use the property to

operate a model airplane club. The Department's staff report identified the present land use as agricultural and noted that a gravel pit was located north of the property. At the hearing on the petition, John Scott testified that the petitioners intended to farm most of the property and lease the remaining portion to a model airplane club. Amid opposition, the Peoria County Board granted the special use permit. On May 10, 1993, AGC sold the property to the Steegs and the Scotts for approximately $72,000.

¶ 8        On December 7, 2001, while the Steegs and the Scotts still owned the property, Steven Maxheimer and Joseph LaHood filed a petition for special use to allow mineral extraction on three adjacent parcels totaling 240 acres, which included the 80-acre property in this appeal. The petition listed the present use as "agriculture" and the proposed use as "mineral extraction." In their petition, Maxheimer and LaHood noted the large active mining operation on the north side of Truitt Road and indicated that part of the 240 acres on the south side of the road "has had a gravel pit on it." The engineering report that was filed with the petition included a topographical survey. The survey showed the 80-acre property with the existing stockpile.

¶ 9        Residents in the community filed an objection with approximately 917 signatures opposing the request. In response, Maxheimer and LaHood withdrew the petition.

¶ 10        On August 6, 2002, Maxheimer and LaHood entered into an agreement with the Steegs and the Scotts that gave the potential buyers a five-year option to purchase the 80-acre parcel for a purchase price of $640,000. The sellers retained the right to farm the property and to operate a remote-control model airplane club on the property through the year of the closing. The agreement included a contingency that required appropriate zoning to be in place or approved to enable the buyers to conduct their intended business of mineral extraction. Two weeks after the agreement was signed, Maxheimer died in a car accident, and the right to purchase the property was transferred to FLM, a corporation created by Maxheimer's brother, Stan Maxheimer, and LaHood.

¶ 11        In 2007, near the end of the 5-year purchase option, FLM decided to pursue closing on the property. Before the closing date, FLM sought to verify that the nonconforming use certificate was still valid and hired attorney Troy Pudik. On July 5, 2007, the Steegs and the Scotts executed an affidavit, drafted by Pudik, stating that one or more of the nonconforming uses listed in the certificate had been ongoing for as long as they had owned the property, including the "storage, sale, removal and transport of stone, sand and gravel."

¶ 12        On July 18, 2007, Pudik called the Department to inquire about the validity of the nonconforming use certificate. On July 27, 2007, Pudik met with the assistant director of the Department, Kathi Lowder, and gave her a copy of the sellers' affidavit. During that meeting, Lowder told him that the certificate was valid and enforceable. On August 3, 2007, Lowder again confirmed to Pudik that the certificate was valid and promised to provide written confirmation of her opinion. That same day, after receiving verbal confirmation but before receiving Lowder's letter, FLM exercised the option to purchase and closed on the property.

¶ 13        On August 7, 2007, Lowder sent a letter to FLM that stated:

> "This letter is in response to our request as to the status of the above Non-Conforming Use which allowed for the following:
>
> > Strip and remove overburden, mine quarry, extract, process, store, sell, remove and transport across, stone, sand and gravel in, on, under or from the properties.

Our records show that the Non-Conforming Use #370-A was issued on September 10, 1974 to Martin-Marietta Corporation. If a non-conforming use is discontinued or abandoned for six consecutive months, then the use shall not be reestablished or resumed.

Since there is a recorded Non-Conforming Use Certificate for this property, and the use of storage has not been discontinued, it is the position of this department that the Non-Conforming Use Certificate is still valid."

¶ 14 Within months after purchasing the property, FML began the planning phase to develop the 80-acre parcel consistent with its intent to operate a gravel mining facility. LaHood testified that when FLM entered the option-to-purchase contract, the stockpile and the old excavation pit on the 80-acre parcel covered five to six acres. He also testified that Galena Gravel operated a 1000-acre gravel pit on the north side of Truitt Road that was still active at the time of the hearing. He stated that shortly after FLM purchased the property in 2007, FLM began investing additional funds into its Mossville processing facility because the Department told them that it was permissible to mine the property on Truitt Road. FLM upgraded the Mossville facility in anticipation of additional mineral supplies from the Truitt Road property. In addition, Stan Maxheimer testified that FLM decided to proceed with the purchase option on the 80-acre parcel in 2007 due to the Department's confirmation and Lowder's statements that the nonconforming use certificate was still valid. He confirmed that FLM paid $640,000 for the property.

¶ 15 On February 9, 2009, Department director Matthew Wahl sent a letter to FLM stating that the Department was reviewing the company's right to expand the use of the property beyond the existing storage pile. In the letter, Wahl acknowledged the Department's August 2007 correspondence in which Lowder stated that the nonconforming use certificate was still valid. However, Wahl noted, "[s]ince that time I have received further information from the City of Chillicothe which raises serious doubts regarding that prior opinion." He then stated:

"At this time, I believe the Non-Conforming Use in question may have been abandoned prior to the time that you obtained possession of the property. Additionally, I feel it only fair to point out to you that even if the Non-Conforming Use has not been abandoned, you may not have the right to expand the use of the property in question beyond the existing 'storage pile.' "

The letter ended by informing FLM that no action would be taken against the company "[b]ecause you do not appear to be using the property for anything more than the minimal storage already mentioned."

¶ 16 In 2015, the Department received a complaint that mining activities were occurring on the property and sent an inspector, Kevin Miller, to investigate. On January 13, 2015, FLM received a letter from Miller indicating that the company was in violation of the "special use permit" because it was using the property for "excavating." On March 2, 2015, the complaint was closed because no mining activity could be observed on reinspection.

¶ 17 In November 2015, the Department received an affidavit signed by Richard Fislar, the former mayor of Chillicothe and the former chief executive officer of AGC. In the affidavit, Fislar averred that between 1983 and 1993 AGC never used the property for any activities covered under the nonconforming use certificate and that it intended to discontinue and abandon all nonconforming uses.

¶ 18    On May 2, 2016, the Department sent a letter to FLM stating that the covered uses were abandoned for a 10-year period (1983 to 1993) and could not be reestablished. The letter informed FLM that the nonconforming use certificate was revoked and instructed the company to cease and desist all activities under the permit.

¶ 19    Following deliberations, the Zoning Board approved the Department's revocation of the certificate and denied FLM's appeal. The board issued a written decision finding, among other things, that (1) the nonconforming use on the property was abandoned for a period in excess of six months, (2) the stockpile of gravel on the property was insufficient to preserve the nonconforming use, (3) the doctrine of equitable estoppel was not available because "FLM's reliance was not reasonable," and (4) the equitable remedy of *laches* did not apply. In determining that FLM's reliance was not reasonable, the Zoning Board cited the 2001 petition for special use in which FLM stated that the use of the land was "agriculture" and that it had not been mined for some time and the 2002 real estate sales contract in which the Scotts and the Steegs retained the right to plant crops and operate a model airplane club on a portion of the property.

¶ 20    FLM filed a complaint for administrative review in the circuit court. The City of Chillicothe moved to intervene on the basis that the parcel was contiguous to its boundaries, which the court allowed. After reviewing the transcript of the Zoning Board's hearing and considering the parties' written motions and arguments, the circuit court affirmed the Zoning Board's decision.

¶ 21                              II. STANDARD OF REVIEW

¶ 22    FLM seeks review of the Zoning Board's decision pursuant to the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)). In such cases, we review the decision of the administrative agency and not the ruling of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). The degree of deference afforded to the administrative agency's decision depends on whether the question considered is a question of fact, a question of law, or a mixed question of law and fact. *Id.* at 532. A question of fact is reviewed under the manifest weight of the evidence standard, which asks whether the opposite conclusion is clearly apparent, and a question of law is reviewed *de novo*. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). A mixed question of law and fact, which involves an examination of the legal effect of a given set of facts, is reviewed under the clearly erroneous standard. *Marconi*, 225 Ill. 2d at 532; *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 52. A decision is clearly erroneous "where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 23                                  III. ANALYSIS

¶ 24    On appeal, FLM contends that the equitable doctrines of estoppel and *laches* bar the Department from revoking the nonconforming use certificate. FLM argues that the Department is now estopped from taking action to revoke the nonconforming use certificate because FLM reasonably relied on the statements of validity that Lowder made in 2007. FLM also argues that the Zoning Board erred in rejecting its argument that the doctrine of *laches* prevents the

Department from revoking the certificate. Both arguments concern the Zoning Board's resolution of factual questions and will be overturned only if they are against the manifest weight of the evidence.

¶ 25                                            A. Estoppel

¶ 26        The doctrine of equitable estoppel is applicable to municipal bodies. *Kenny Construction Co. of Illinois v. Metropolitan Sanitary District of Greater Chicago*, 52 Ill. 2d 187, 197 (1971). However, courts do not favor its application. *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, ¶ 33. When it is invoked against a governmental entity exercising its governmental functions, estoppel will only apply in compelling or extraordinary circumstances. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 35. Courts will apply equitable estoppel against a public body if the aggrieved party can show that (1) the government entity affirmatively acted, (2) the affirmative act induced substantial reliance, and (3) the aggrieved party substantially changed its position as a result of its justifiable reliance. *Morgan Place*, 2012 IL App (1st) 091240, ¶ 33. The affirmative act may be an act by the municipality itself or by an official with express authority to bind the public entity. *Patrick Engineering*, 2012 IL 113148, ¶ 39. Further, the reliance must be detrimental and reasonable. *Id.*

¶ 27        In determining whether a party's reliance was reasonable, a court must consider all the facts the party knew, as well as those that the party could have discovered through the exercise of ordinary care. *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 456 (2004). A party's reliance may be reasonable " 'where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth.' " (Internal quotation marks omitted.) *Siegel Development, LLC v. Peak Construction, LLC*, 2013 IL App (1st) 111973, ¶ 114 (quoting *Sims v. Tezak*, 296 Ill. App. 3d 503, 511 (1998)).

¶ 28        Whether estoppel should be applied against a municipal entity depends on the circumstances of the particular case. *Morgan Place of Chicago*, 2012 IL App (1st) 091240, ¶ 33. "If under all of the circumstances, the affirmative acts of the public body have created a situation where it would be inequitable and unjust to permit it to deny what it has done or permitted to be done, the doctrine of estoppel may be applied against it." *Stahelin v. Board of Education*, 87 Ill. App. 2d 28, 39 (1967).

¶ 29        FLM relies on *County of Du Page v. K-Five Construction Corp.*, 267 Ill. App. 3d 266 (1994), in support of its position that the doctrine of estoppel should be applied in this case because it reasonably relied on the Department's 2007 communication. In *K-Five Construction*, a construction company reestablished an asphalt plant after not producing asphalt on its property for 10 years. *Id.* at 268. After the plant was reestablished, the company sold asphalt produced at the plant directly to the county for three years. During that time, the director of the county's building department sent two letters to county residents concluding that the plant was a lawful nonconforming use, and copies of those letters were sent to the construction company. The company then spent $600,000 in improvements to the plant. After the improvements, the county filed suit, alleging that the plant violated the county's zoning ordinance. *Id.* at 269. The appellate court, affirming the trial court's decision, held that the county was equitably estopped from enforcing the ordinance because the two letters were an affirmative act justifying the company's reliance. *Id.* at 273-75. The court found that the

county's purchase of the asphalt from the company while the company was operating the plant without a permit also constituted an affirmative act. The court held that because the company had justifiably relied upon the affirmative acts of the county by operating and improving the plant, the county was estopped from enforcing its zoning ordinance. *Id.* at 275.

¶ 30    This case closely resembles *K-Five Construction*. Here, it is undisputed that Lowder, acting as the Department's assistant administrator, informed FLM on two occasions that the certificate was valid because storage had continued on the property. Lowder then sent a follow-up letter that expressly stated that the nonconforming use certificate allowed for "mining and extraction of stone, sand, and gravel" and was "still valid." Based on the Department's communication and its promise to send written verification, FLM purchased the property for $640,000 and initiated plans to develop it for mineral extraction.

¶ 31    These facts are more compelling than the scenario in *K-Five Construction*. In that case, the relying party only received a copy of the letter that was sent to local residents. Here, FLM sought confirmation from the responsible municipal agency before closing on the property and received direct communication from the Department that the nonconforming use certificate was valid—an affirmative act by a governmental entity.

¶ 32    The Zoning Board maintains that FLM's reliance on the Department's affirmative act was unreasonable because FLM was aware that active mining had ceased and that the sellers were not in the business of mining gravel. We disagree. Although FLM knew that the property was not being mined at the time of purchase, it had no knowledge that the nonconforming use permit was no longer valid or had otherwise been revoked. Indeed, the manifest weight of the evidence demonstrates that FLM reasonably relied on the Department's communications that the certificate was valid. Lowder made two statements to FLM confirming the validity of the certificate: one on July 27, 2007, and one on August 3, 2007. Those statements were made prior to the purchase of the 80-acre parcel and were made as to a fact within the Department's knowledge.

¶ 33    Moreover, the Department's assertion that the nonconforming use was still valid was not implausible. Lowder's statements contained nothing so improbable as to cast doubt regarding their truth. FLM knew that the certificate had been issued in 1974 and that a large three-acre stockpile had been present on the property since the 1970s. In addition, the Steegs and the Scotts signed an affidavit stating that, during their ownership, they had continued to use the property for the storage, removal, and transport of sand and gravel. Illinois courts have held that the continued existence of a test pit or a large stockpile is sufficient to preserve the validity of the nonconforming use certificate. See *County of Du Page v. Elmhurst-Chicago Stone Co.*, 18 Ill. 2d 479, 484 (1960) (mining started 25 years after certificate was issued); see also *Bainter v. Village of Algonquin*, 285 Ill. App. 3d 745, 752-53 (1997) (stockpile was adequate activity to preserve nonconforming use certificate where mining company purchased property for future mining extraction).

¶ 34    Thus, FLM's reliance on the Department's communication was reasonable. While the existence of the pit and stockpile may not avoid a finding of abandonment now that more information is known, FLM justifiably relied on the Department's position in 2007 that the nonconforming use certificate was valid. See *Siegel Development*, 2013 IL App (1st) 111973, ¶¶ 114-16.

¶ 35    Based on the facts presented at the Zoning Board hearing, the evidence demonstrates that FLM justifiably relied on the Department's express statement that the nonconforming use

certificate was valid when it decided to exercise the option to purchase the property in 2007. The Department informed FLM that the certificate was valid, and the company expended large sums of money to purchase the property in reliance on a valid certificate. The Department then waited nine years before revoking it. In light of these circumstances, it would be inequitable to allow the Department to revoke the nonconforming use certificate. Accordingly, we conclude that the Zoning Board's finding that FLM's reliance was unreasonable is against the manifest weight of the evidence and the doctrine of equitable estoppel applies.

¶ 36                                                     B. *Laches*
¶ 37          Having determined that the Department is estopped from revoking the nonconforming use certificate, we need not consider FLM's alternative argument of *laches*.

¶ 38                                              IV. CONCLUSION
¶ 39          The judgment of the circuit court of Peoria County is reversed, and the cause is remanded to the Peoria County Zoning Board of Appeals for further proceedings consistent with this opinion. See 735 ILCS 5/3-111(a)(6) (West 2018) (where a hearing has been held by the agency, reviewing court has authority to remand the decision and give instructions).

¶ 40          Reversed and remanded.