2022 IL App (3d) 210113

Opinion filed May 20, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| LISSA SMALL, | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| Plaintiff-Appellee, | ) | La Salle County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| THE BOARD OF EDUCATION OF | ) | |
| STREATOR TOWNSHIP HIGH SCHOOL | ) | |
| DISTRICT NO. 40; NICHOLAS McFADDEN, | ) | |
| STEVE BIROSCHIK, WILLY WILLIAMSON, | ) | |
| KAREN RICCA, BILL DARROW, DIANNA | ) | |
| SCHULER, and EARL WOELTJE in Their | ) | |
| Official Capacities as Board Members of the | ) | |
| Board of Education of Streator | ) | |
| Township High School District No. | ) | Appeal No. 3-21-0113 |
| 40; MICHAEL I. PONTICELLI, in His Official | ) | Circuit No. 16-MR-237 |
| Capacity as Hearing Officer; MATTHEW | ) | |
| SEATON, in His Official Capacity as | ) | |
| Superintendent; AMY JO MASCAL, in Her | ) | |
| Official Capacity as Principal; and THE | ) | |
| ILLINOIS STATE BOARD OF EDUCATION, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (The Board of Education of Streator Township | ) | |
| High School District No. 40, Nicholas | ) | |
| McFadden, Steve Biroschik, Willy Williamson, | ) | |
| Karen Ricca, Bill Darrow, Dianna Schuler, and | ) | The Honorable |
| Earl Woeltje, | ) | Joseph P. Hettel, |
| | ) | Judge, presiding. |
| Defendants-Appellants). | ) | |

_____

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice Hauptman dissented, with opinion.

_____

**OPINION**

¶ 1        The plaintiff, Lissa Small, sought administrative review of a decision of defendant Board of Education of Streator Township High School District No. 40 (the Board) that dismissed Small, a tenured guidance counselor, from the high school's employ. The circuit court reversed the Board's decision, and the Board appealed. On appeal, the Board argues that its decision should be upheld because the conduct in which Small engaged was irremediable. We reverse the Board's decision.

¶ 2                                         I. BACKGROUND

¶ 3        Small began employment as a guidance counselor with the high school in 2004. She had obtained tenure by September 15, 2015, when the Board notified her that she was being discharged from the high school's employ. The notice and bill of particulars stated, *inter alia*, that Small "failed to respond appropriately to a report that a teacher was having an inappropriate relationship with a student, and you failed to exercise proper professional responsibility in connection with the matter." It also stated that Small had reasonable cause to believe that a female student, "Student B," was abused and failed to report the matter to the Department of Children and Family Services (DCFS), pursuant to section 4 of the Abused and Neglected Child Reporting Act (the Act) (325 ILCS 5/4 (West 2014)) and school district policy No. 5:90 (hereinafter Policy 5:90). Further, the notice deemed Small's conduct irremediable.

¶ 4        Prior to this time, Small had never been disciplined for any reason and had never received any poor performance reports.

2

¶ 5          In February 2016, an administrative hearing was held before an impartial hearing officer who had been selected by the parties. Multiple witnesses testified at the hearing, and the facts established as a result of the hearing are not in dispute.

¶ 6          The hearing officer issued his written recommendation in May 2016. His statement of facts included most of the following. Around December 2014, Student B told a male student, "Student A," that she had an inappropriate relationship with a teacher, RV, at the high school during the 2013-14 school year. The students had a second conversation in December 2014 during a class. Student A asked Student B for permission to tell someone in administration about the situation. Student B agreed after stating she did not want to tell someone herself, as she was concerned about potentially being punished.

¶ 7          Student A was allowed to leave class, and he went to see Small, who was his guidance counselor, in her office. Student A told Small that Student B had an inappropriate relationship with RV during the previous school year. He also said that Student B told him that RV had sent her inappropriate text messages and naked pictures of himself and that she had sent naked pictures to RV as well. Small discussed the matter with Student A for 15 to 20 minutes, during which time Student A told Small that he did not like RV, whom he had as a health and fitness teacher, and that RV had kicked Student A out of class at one time in the past for reasons he considered unfair. Also during the discussion, Small informed Student A that she needed first-hand information about the situation, so she asked or directed Student A to have Student B come talk to her directly.

¶ 8          Student A returned to class and told Student B that Small needed to speak to Student B directly. Student B told Student A that she would consider it.

¶ 9 Within approximately one day of the discussion she had with Student A, Small approached Student B's guidance counselor, Brad Brittin. As they discussed what to do, Small offered to speak to Student B herself in case Student B would be more comfortable talking to a female rather than a male. Small and Brittin did not come to any decisions on what to do.

¶ 10 Thereafter, Small sent passes on at least three occasions to Student B; these passes asked Student B to come talk to Small. At least one pass was sent before Christmas break in December 2014, and at least two passes were sent after school resumed in early January 2015. Student B never responded to Small in any way.

¶ 11 Small did not speak with anyone other than Brittin about the matter.

¶ 12 After school resumed, Student B began having attendance issues that resulted in her being dropped by the high school in March 2015.

¶ 13 Between December 2014 and May 2015, Student B's mother met with Brittin on numerous occasions about her daughter. Small was present at times during the meetings. Student B's mother also met with Small individually on one occasion and spoke with her on two other occasions. They discussed Student B's declining academic performance and Student B's boyfriend. At no time did Small or Brittin tell Student B's mother about the information Student A had relayed to her in December 2014.

¶ 14 Regarding Student B's boyfriend, testimony at the administrative hearing revealed that Student B had turned 18 in early January 2015 and had moved in that day with her boyfriend at his father's house (Student B's mother described it as Student B running away from home). Further, testimony from several witnesses showed that Student B and her boyfriend were both frequently skipping school until she dropped out in March 2015.

4

¶ 15    Notably, Student B testified that she was a student of RV's during the two quarters from August to December 2014, but not during the following quarter starting in January 2015. Beginning at that time and ending when she dropped out of school in March 2015, Student B saw RV at times in the school's common area or in the gym. She did not look at him and avoided him whenever she could. Further, she testified that she was skipping school for multiple reasons—not just because of RV but also because she hated her math class and because she was having family issues.

¶ 16    In April 2015, Student B and her boyfriend moved in with Student B's mother. Student B's mother sought counseling help at the high school to ensure that her daughter's boyfriend could still graduate. Student B's mother stated that she did not agree with the way her daughter's boyfriend was raised or "the way he behaved" and that she needed help with the situation because "never had I had a boy come into my home that—well, I just never had a daughter's boyfriend live with me before. I never had a boy who had been in trouble before live with me. I didn't know how to live with it ***."

¶ 17    In May 2015, during an investigation into potentially improper conduct between a student and a paraprofessional (not RV) employed by the school district, several students informed administration that RV had been involved in an inappropriate relationship with a student (not Student B). The school district's superintendent assigned Brittin to interview RV and assigned Small to interview the student. Small informed the superintendent and the high school principal that she had heard rumors about RV.

¶ 18    After the interviews had been completed, it was determined that the allegations made by the students about RV during the investigation into the paraprofessional had been fabricated by three students. However, those students informed a teacher that there were other students who

5

may have in fact had inappropriate relationships with RV. Accordingly, another investigation into RV was opened; this time, the Streator Police Department was called.

¶ 19    During the investigation, Student A was interviewed by a Streator Police Department detective and an investigator from the state's attorney's office in the presence of the high school principal. Student A said that Student B had told him about her inappropriate relationship with RV and that he had relayed that information to Small. Also during the investigation, RV admitted to sending naked pictures of himself to Student B and to having sexual contact with two students after they had graduated. RV was arrested after also admitting that he had sexual contact with a 16-year-old student at the high school.

¶ 20    Small was also interviewed. She confirmed that Student A had approached her with information about Student B in December 2014. She said, *inter alia*, that she told Student A that she could not act on an unsubstantiated rumor. She also mentioned that, since RV's arrest, she was remorseful that she had not done anything more with the information she had received back in December 2014.

¶ 21    The day after the interview, Small sent an e-mail to the superintendent in which she stated, *inter alia*:

> "If I had other students come to me with the same rumors, then I would have come to admin with it. But one statement from one student, that wasn't backed up at the time by the alleged victim, just seems like so little at the time. In a small town, one hears all kinds of rumors—I have heard some pretty ugly things about people. If we pursued every one of those it would be so ugly and destructive to so many people. In hindsight this rumor was a

6

smoking gun. I feel truly, deeply horrified by the whole thing. I love my students, I love my job. It is tearing me up that I could have missed something so awful."

In a subsequent meeting with the superintendent and the high school principal, Small stated that she had not made any record of the meeting with Student A besides some comments on a Post-It note, which was never found.

¶ 22    Small testified that she had made reports to DCFS in the past based on unsubstantiated rumors and that DCFS would not accept the reports. Small detailed one time when a female first-year student approached her and said that she thought her friend was being hit by her mother. The first-year student had not witnessed the alleged abuse. When Small called DCFS to report the matter, DCFS told her that they would not take the report because the first-year student had not witnessed the abuse, Small had not observed any signs of abuse, and Small had not talked to the victim directly.

¶ 23    In his discussion of the matter, the hearing officer noted that Small was considered a mandatory reporter under the Act (325 ILCS 5/4 (West 2014)) and that she violated it, as well as Policy 5:90, by failing to report the matter to DCFS. Additionally, the hearing officer found that "[a]s a trained professional counselor, Small had enough information to determine Student A's report gave rise to more than a bare, imaginary, or purely conjectural suspicion, as he was relating allegations based on information he was receiving directly from a victim of a potential sexual predator." The hearing officer stated that Small should have done more under the circumstances to investigate the matter. Additionally, the hearing officer concluded that Small's conduct was irremediable because no further training, education, or experience would have caused her to act differently in the same or a similar circumstance.

7

¶ 24 On June 28, 2016, the Board adopted a resolution ordering Small's dismissal from the high school's employ. The Board adopted the hearing officer's findings without supplementation.

¶ 25 Small sought review of the Board's decision in the circuit court. The circuit court issued its written order on February 16, 2021, in which it found that Small's conduct was in fact remediable and that the Board's decision was clearly erroneous. The Board appealed.

¶ 26                                    II. ANALYSIS

¶ 27 On appeal, the defendants argue that the Board's decision to dismiss Small should be upheld.

¶ 28 The dismissal of a tenured teacher for cause is governed by section 24-12(d) of the School Code. 105 ILCS 5/24-12(d) (West 2016). When the teacher requests a hearing on the charges brought against him or her, the school board has the burden of proving the charges before a hearing officer by a preponderance of the evidence. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 53.

> "The school board, within 45 days after receipt of the hearing officer's findings of fact and recommendation as to whether (i) the conduct at issue occurred, (ii) the conduct that did occur was remediable, and (iii) the proposed dismissal should be sustained, shall issue a written order as to whether the teacher must be retained or dismissed for cause from its employ. The school board's written order shall incorporate the hearing officer's findings of fact, except that the school board may modify or supplement the findings of fact if, in its opinion, the findings of

8

fact are against the manifest weight of the evidence." 105 ILCS 5/24-12(d)(8) (West 2016).

¶ 29    In appeals involving decisions of an administrative agency, we review the agency's decision and not the circuit court's ruling. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006) (*per curiam*). Review of a school board's dismissal decision is twofold. *Beggs*, 2016 IL 120236, ¶ 63. First, "we will review the Board's supplemental factual findings, as well as the factual findings of the hearing officer that were incorporated unmodified into the Board's decision, to determine whether those findings were against the manifest weight of the evidence." *Id.* Second, "we must determine whether the findings of fact provide a sufficient basis for the agency's conclusion that cause for discharge does or does not exist." *Id.* "We apply the clearly erroneous standard of review to this mixed question of fact and law, *i.e.*, whether we are left with the definite and firm conviction that a mistake has been committed when applying the established facts to the applicable legal standard for discharge." (Internal quotation marks omitted.) *Id.*

¶ 30    In this case, the defendants argue that Small's conduct was irremediable. "The test in determining whether a cause for dismissal is irremediable is whether damage has been done to the students, faculty or school, and whether the conduct resulting in that damage could have been corrected had the teacher's superiors warned her." *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622 of Tazewell County*, 67 Ill. 2d 143, 153 (1977).

¶ 31    This appeal's focus is on the second part of the *Gilliland* test. In that regard, the Board contends first that because Small understood her status as a mandatory reporter under the Act, her failure to report the situation was solely her responsibility and "[n]o additional training was going to remediate her failure to report the abuse of Student B."

9

¶ 32     In relevant part, section 4 of the Act (325 ILCS 5/4 (West 2014)) stated that education personnel like Small were required to immediately report to DCFS when they have reasonable cause to believe that a child known to them in their professional or official capacities may be an abused or neglected child. *Id.* "Reasonable cause" is not defined in the Act. *Id.* §§ 1 *et seq.* The Second District has opined that "[f]or purposes of the Reporting Act, the issue of whether school personnel have reasonable cause to report suspected allegations of abuse is determined by the objective belief of a reasonable person, not the school personnel's subjective belief." *Doe v. Dimovski*, 336 Ill. App. 3d 292, 297 (2003).

¶ 33     It is axiomatic that determining the objective belief of a reasonable person in a situation in which reporting may be mandatory necessarily requires an examination of the unique circumstances surrounding the situation. The undisputed facts of this case show that Student A relayed hearsay to Small of inappropriate conduct, including texts and exchange of nude photographs between RV and Student B, that had allegedly occurred during the previous school year. At the same time he did so, Student A also admitted to Small that he disliked RV, at least in part because RV kicked Student A out of his class on one occasion. Small had noted that she worked in an environment in which such rumors were not uncommon; in fact, a fabricated rumor regarding RV was circulated during the investigation into allegedly inappropriate contact between a different employee and a different student. Even assuming that Small abrogated her duties in the manner in which she responded to Student A, she was presented with an unsubstantiated rumor—hearsay—from a student who had a motive to lie. She had attempted to report unsubstantiated rumors to DCFS in the past and was told that such reports would not be accepted. She was aware that she had to undertake efforts to substantiate Student A's hearsay before a report would be accepted. Under an objective belief of a reasonable person in Small's

10

position and possessed with her knowledge, it cannot be said that she had reasonable cause such that an immediate duty to report arose under the Act. The Board's finding to the contrary was clearly erroneous.

¶ 34        It must be noted, however, that Policy 5:90 does not contain the "reasonable cause" language that exists in the Act. In relevant part, Policy 5:90 provided that "[a]ny District employee who *suspects or receives knowledge* that a student may be an abused or neglected child *** shall" immediately report the matter to DCFS and inform the superintendent or principal that such a report has been made. (Emphasis added.) Streator Township High School District No. 40 Board Policy 5:90 (adopted Feb. 18, 2014). Thus, Policy 5:90 appears to have the potential to trigger the duty to report to DCFS in situations not required by the Act, including this one. The policy does not define "suspect" or "receives knowledge," however.

¶ 35        The fact that both "suspect" and "receives knowledge" are included is significant. A common and ordinary definition of "suspect" is "to imagine to exist or be true, likely, or probable." Webster's Ninth New Collegiate Dictionary 1189 (1990). A common and ordinary definition of "knowledge" is "the fact or condition of knowing something with familiarity gained through experience or association." Webster's Ninth New Collegiate Dictionary 665 (1990). By listing "receives knowledge" separately, the policy evinces an intent that the information leading one to "suspect" a student is abused or neglected is not "received"—at least not in the same way as one "receives" knowledge. Perhaps "suspects" means information that one inadvertently obtains and "receives knowledge" means obtaining information that the source intentionally communicated to the recipient. Whatever the case, there is sufficient ambiguity in the Policy to raise a question of whether receiving hearsay of allegedly inappropriate contact between a teacher and a student, without more, is sufficient to constitute an employee "suspecting" or

11

"receiving knowledge" that a student may be abused or neglected. And again, like the contextual analysis warranted under section 4 of the Act, it would appear that whether an individual "suspects" or has "received knowledge" of a student possibly being abused or neglected under Policy 5:90 warrants a consideration of the specific circumstances surrounding the situation. Under the specific circumstances of this case, we find no meaningful distinction between the Act and Policy 5:90—the hearsay relayed to Small about Student B does not clearly meet the policy's requirement of "suspecting" or "receiving knowledge." The lack of specificity in Policy 5:90's language belies the Board's conclusion that Small violated Policy 5:90.

¶ 36        Overriding the linguistic distinctions, however, is the fact that both section 4 of the Act and Policy 5:90 require a report to DCFS. This, in turn, requires the mandatory reporter to have information, no matter how stated or defined, that DCFS will accept. The uncorroborated hearsay information conveyed by Student A to Small did not fall within that category.

¶ 37        The significance of whether Small violated section 4 of the Act or Policy 5:90 is manifest in the requirement of the *Gilliland* test's second prong. Assuming that "damage" did occur, conduct is irremediable only if the conduct could not have been corrected. *Gilliland*, 67 Ill. 2d at 153. If Small's conduct was not clearly violative of Policy 5:90 in particular, then the appropriate conclusion to draw is that her conduct could have been corrected. If district policy is for any and all unsubstantiated rumors, such as the hearsay relayed to Small in this case, to be reported to DCFS or administration, then that requirement should have been and needs to be clearly stated.

¶ 38        Many, if not most, cases involving the mandatory reporting requirement are clear. Tweaking the facts of this case slightly would clearly have triggered the duty to report, such as if Student B had been the one to approach Small or if she had responded to Small's request to come in and talk after Student A had talked to Small. But this case does not fit neatly within the

12

parameters of the applicable law. Under the unique circumstances of this case, we hold that Small's conduct was in fact remediable and that the Board therefore erred when it found otherwise.

¶ 39    In concluding that Small had a duty to report to DCFS what Student A relayed to her regarding Student B (*infra* ¶¶ 56-65), the dissent cites extensively from DCFS's "Manual for Mandatory Reporters." In this regard, we note the following:

> "[W]here *** an agency is charged with the administration and enforcement of the statute, courts will give deference to the agency's interpretation of any statutory ambiguities. [Citations.] Thus, '[a] court will not substitute its own construction of a statutory provision for a reasonable interpretation adopted by the agency charged with the statute's administration.' [Citation.] Courts, however, are not bound by an agency's interpretation that conflicts with the statute, is unreasonable, or is otherwise erroneous. [Citations.]" *Hadley v. Illinois Department of Corrections*, 224 Ill. 2d 365, 370-71 (2007).

See also *Medponics Illinois, LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 31 (holding that "an agency's interpretation of its own regulations is entitled to substantial deference and weight, as the agency makes informed judgments based on its expertise and experience and provides a knowledgeable source in ascertaining the intent of the legislature"). The dissent ignores the undisputed testimony from Small that past experience had taught her that DCFS did not accept reports of unsubstantiated rumors. No evidence was ever presented to show that DCFS did accept reports of unsubstantiated rumors, including the type at issue in this case. The

13

record in this case reveals neither legal nor factual bases for disregarding DCFS's reported interpretation of the applicable statutes or its own regulations.[1]

¶ 40　　　We likewise reject the dissent's additional claim that information Small allegedly received during the quarter following Student A's disclosure "undoubtedly" triggered the duty to report. *Infra* ¶ 62. The dissent's suggestion that Student B's "declining academic performance, discontinued athletic participation, deteriorating attendance, and eventual decision to drop out of school" "should have heightened her suspicion of abuse" (*infra* ¶ 62) is based on speculation and hindsight. In fact, Student B's mother had reported her own serious concerns about significant developments in her daughter's deepening relationship with her boyfriend between January and March 2015—developments suggesting a more contemporaneous and likely explanation for Student B's declining attendance, participation, and academic performance.

¶ 41　　　In addition, multiple other witnesses testified at the administrative hearing that Student B had turned 18 in early January 2015 and had immediately moved in with her boyfriend. Additional testimony was presented to show that Student B and her boyfriend were both frequently skipping school during that quarter and that Student B herself testified to having multiple reasons for skipping school, not only to avoid RV but also because she hated her math class and because she was having family issues. Further, the dissent incorrectly states that Student B was in RV's class during the quarter starting in January 2015[2] and has incorrectly attributed certain conduct of RV from the time period between August and December 2014 to the

---

[1]Additionally, no law imposed any duty on Small to report the alleged abuse to Student B's mother, despite the dissent's suggestion otherwise (*infra* ¶ 63).

[2]Student B testified at the administrative hearing that once she learned she was scheduled to be in RV's class for the second semester, which started in January 2015, she switched out of his class and into a class taught by a different instructor. Therefore, the hearing officer's finding that Student B was in RV's class during the second semester of the 2014-15 school year is against the manifest weight of the evidence. See *Beggs*, 2016 IL 120236, ¶ 63.

time Student B was still in school between January and March 2015. For these reasons, it is not as clear as the dissent suggests either that (1) there is a significant causal link between the abuse RV inflicted on Student B during the 2013-14 school year and the events that took place during early 2015 or (2) Small should have recognized such a link and acted upon it.

¶ 42     Next, the Board argues that Small's conduct was irremediable because it was criminal.

¶ 43     In relevant part, section 4.02 of the Act states that "[a]ny other person required by this Act to report suspected child abuse and neglect who willfully fails to report such is guilty of a Class A misdemeanor for a first violation and a Class 4 felony for a second or subsequent violation." 325 ILCS 5/4.02 (West 2014).

¶ 44     We have already held that Small's conduct did not violate section 4 of the Act (325 ILCS 5/4 (West 2014)). Moreover, we note that the La Salle County State's Attorney's Office specifically considered and declined to bring any charges against Small. Under these circumstances, we cannot find that her conduct was criminal, and we therefore find that it was not *per se* irremediable.

¶ 45     For the foregoing reasons, we hold that Small's conduct was remediable and that the Board's decision dismissing Small must be reversed.

¶ 46                                    III. CONCLUSION

¶ 47     For the foregoing reasons, the decision of the Board of Education of Streator Township High School No. 40 is reversed.

¶ 48     Circuit court judgment affirmed.

¶ 49     Board decision reversed.

¶ 50     JUSTICE HAUPTMAN, dissenting:

15

¶ 51    I respectfully dissent from the opinion of my respected colleagues in the majority because I believe Small received a credible allegation of abuse from Student A. I also disagree that Small did not have "reasonable cause to believe" or sufficient information to "suspect[]" Student B may be abused under section 4 and Policy 5:90. Moreover, while I concur that Small's conduct was not criminal, as to be *per se* irremediable, I respectfully dissent from the opinion that her failure to comply with section 4 and Policy 5:90 was not irremediable. Thus, I would affirm the Board.

¶ 52                                A. Standard of Review

¶ 53    Initially, while the parties' briefs are largely limited to the issue of irremediability, I note that our review is governed by the Administrative Review Law and extends to all questions of law and fact presented by the record. See 105 ILCS 5/24-16 (West 2020); 735 ILCS 5/3-102, 3-110 (West 2020). On questions of fact, "[t]he findings and conclusions of the administrative agency *** shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2020); see also *Van Dyke v. White*, 2019 IL 121452, ¶ 68 (stating, "[i]n examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of the agency," but is "limited to ascertaining whether such findings of fact are against the manifest weight of the evidence"). Further, I emphasize that our court may reverse the Board's decision only if it was clearly erroneous, which means, on review of the entire administrative record, we are " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 392-93, 395 (2001); accord *FLM Enterprises, LLC v. Peoria County Zoning Board of Appeals*, 2020 IL App (3d) 180634, ¶ 22. We do not "blindly defer" to the Board's decision, but the clearly erroneous standard of review is nevertheless "largely deferential" to the Board's

16

experience and expertise when resolving matters within its purview. See *AFM Messenger Service*, 198 Ill. 2d at 395; *Fraternal Order of Police, Chicago Lodge No. 7 v. Illinois Labor Relations Board*, 2011 IL App (1st) 103215, ¶ 18. Since I am not left with a definite and firm conviction that a mistake was committed, I respectfully disagree that the Board's decision was clearly erroneous.

¶ 54                                B. Section 4 and Policy 5:90

¶ 55        At the outset, I find it unnecessary to parse the language "reasonable cause to believe" under section 4 and "suspects or receives knowledge" under Policy 5:90.[3] See *supra* ¶¶ 34-35. I believe a factual scenario that meets the former standard also meets the latter standard. As support, I note "reasonable cause to believe," as used in section 4, has been found to be the equivalent of the term "suspect," as used in the Code of Federal Regulations. See *Dimovski*, 336 Ill. App. 3d at 297 (citing 45 C.F.R. § 1340.3-3(d)(2) (1977), 1977 Ill. Att'y Gen. Op. 173). Thus, I submit any difference in "reasonable cause to believe" and "suspect[]" is inconsequential because each phrase "would cover the same set of circumstances leading a person to report an instance of child abuse or neglect." See *id.*; 1977 Ill. Att'y Gen. Op. 173. Since I conclude Small had "reasonable cause to believe" Student B may be abused under section 4, I also conclude Small had sufficient information to "suspect[]" Student B may be abused under Policy 5:90.

¶ 56        Under section 4, all credible allegations of abuse or suspected abuse, received by a mandated reporter, must be reported to DCFS.[4] See 325 ILCS 5/4 (West 2014); *Dimovski*, 336

_____

[3]However, I note, in addition to the majority's definition, "suspect" means "to imagine (one) to be guilty or culpable on slight evidence or without proof." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/suspect (last visited May 5, 2022) [https://perma.cc/6M6M-BNX4].

[4]The General Assembly made various amendments to section 4, effective January 1, 2020, and January 1, 2022. See 325 ILCS 5/4 (West 2020); Pub. Act 102-604 (eff. Jan. 1, 2022). Most relevant here is the amendment creating section 4(a)(4), effective January 1, 2020, which provides "[e]ducation

Ill. App. 3d at 297; *People v. Willigman*, 2021 IL App (2d) 200188, ¶ 34 (discussing *Dimovski*). After receiving a credible allegation, a mandated reporter is "divested of any discretion to determine what constitutes 'reasonable cause to believe' or whether such abuse *actually* occurred." (Emphasis added.) See *Dimovski*, 336 Ill. App. 3d at 297; *Willigman*, 2021 IL App (2d) 200188, ¶¶ 34-35 (discussing *Dimovski*). If this were not the rule, then "the goal of protecting children from sexual abuse would be undermined." *Dimovski*, 336 Ill. App. 3d at 297. Therefore, while I agree "reasonable cause" is determined by the objective belief of a reasonable person and the use of that phrase in section 4 implies some degree of judgment or discretion by mandated reporters, I submit that the mandated reporter must first weigh certain credibility factors, including the identity of the person making the allegation, the recency of the alleged abuse, and whether details of the event reveal abusive conduct and support the allegation. See *Willigman*, 2021 IL App (2d) 200188, ¶¶ 29, 34-35; *Dimovski*, 336 Ill. App. 3d at 297. If these factors support the credibility of an allegation, then I submit the result is "reasonable cause."

¶ 57        Further, DCFS's 2015 manual for mandated reporters, which was admitted as "Tenured Teacher Exhibit 3" at the administrative hearing and is cited by the parties on appeal, states, when considering if there is "reasonable cause" to make a report, "there are some issues that are important *** to consider in deciding whether to report an incident as suspected abuse." Ill. Dep't of Children & Family Services, *Manual for Mandated Reporters* 8 (May 2015 rev. ed.); accord *Willigman*, 2021 IL App (2d) 200188, ¶ 37 (citing Ill. Dep't of Children & Family

personnel, including any[ ] school personnel (including administrators and certified and non-certified school employees)," must immediately report to DCFS "when they have reasonable cause to believe that a child known to them in their professional or official capacities may be an abused child or a neglected child." See 325 ILCS 5/4(a)(4) (West 2020); compare 325 ILCS 5/4 (West 2014). Small is undisputedly a mandated reporter under each of the aforementioned versions of section 4. Since the relevant conduct in this case occurred after 2014 but before the amendments to section 4 in 2020 and 2022, I cite to only the 2014 version of that statutory provision. See 325 ILCS 5/4 (West 2014).

Services, *Manual for Mandated Reporters* 18 (Sept. 2020 rev. ed.), https://www2.illinois.gov/

dcfs/safekids/reporting/Documents/cfs_1050-21_mandated_reporter_manual.pdf

[https://perma.cc/MDM2-9E76]). The following guidance was provided to mandated reporters:

> "• Did you observe evidence that some damage was done to the child? ***
> In sexual abuse cases, it is usually information from the victim about a
> specific incident of molestation, penetration, or exploitation. ***
>
> • What communication has the child provided? Is the information
> consistent and plausible with what you have observed?
>
> • If the explanation comes from someone other than the child, how
> credible and/or complete is the information?
>
> • Since the signs of sexual abuse can be uncertain, if a child tells you
> he/she is being abused by a caretaker or person responsible for the child's welfare,
> report it.
>
> • Have there been past incidents which, in retrospect, may have been
> suspicious?" Ill. Dep't of Children & Family Services, *Manual for Mandated
> Reporters* 8 (May 2015 rev. ed.).

Accord *Willigman*, 2021 IL App (2d) 200188, ¶ 37 (citing Ill. Dep't of Children &

Family Services, *Manual for Mandated Reporters* 19 (Sept. 2020 rev. ed.)). As such,

"reasonable cause to believe" requires "something more than a mere utterance" alleging

abuse, such that a mandated reporter may exercise some judgment and discretion to

decide what constitutes abuse under the Act and whether it *likely* occurred. See

*Willigman*, 2021 IL App (2d) 200188, ¶ 35; see also *Dimovski*, 336 Ill. App. 3d at 297

(stating, while a mandated reporter "may initially investigate the credibility of any

19

rumors of sexual abuse, whether there was reasonable cause to report the allegations is an objective determination").

¶ 58     In providing this guidance, DCFS makes clear, "[w]hile it is not the function of the mandated reporter to investigate, enough information must be obtained to determine if a Hotline call is needed." Ill. Dep't of Children & Family Services, *Manual for Mandated Reporters* 8 (May 2015 rev. ed.); accord *Willigman*, 2021 IL App (2d) 200188, ¶ 37 (citing Ill. Dep't of Children & Family Services, *Manual for Mandated Reporters* 18 (Sept. 2020 rev. ed.)). DCFS's 2015 manual also informed mandated reporters that the following conditions were required for an investigation: (1) a victim under the age of 18, (2) a perpetrator who is, among other possible identities, a person who knows the child through an official capacity or position of trust, such as a teacher, (3) a specific incident of abuse or a specific set of circumstances involving suspected abuse, and (4) a demonstrated harm or substantial risk of physical or sexual injury to the child. Ill. Dep't of Children & Family Services, *Manual for Mandated Reporters* 9 (May 2015 rev. ed.).

¶ 59     Again, under the above guidance, mandated reporters are tasked with reporting alleged abuse but not actually investigating those allegations. DCFS's 2015 manual for mandated reporters clarifies the roles of a mandated reporter and DCFS by stating:

"[The] role as a mandated reporter is to inform the department when you determine there is reason to believe that a child has been harmed or is in danger of being harmed—physically, sexually, or through neglect—and that a caretaker either committed the harm or should have taken steps to protect the child from the harm. *** The *function of the Hotline worker* is to determine whether or not the harm to the child as described by the reporter qualifies as abuse or neglect under the State's definition and can be investigated by DCFS. It is *not* the job of the

20

Hotline worker to make a determination that the suspected abuse has actually occurred. This is the function of the DCFS child protection specialist." (Emphases in original.) *Id.*

After receiving a report from the mandated reporter, who is entitled to confidentiality and immunity from liability for making the report, DCFS initially investigates whether reasonable cause actually exists. See 325 ILCS 5/7.4(e), 7.19, 9, 11 (West 2014); *In re J.C.*, 2012 IL App (4th) 110861, ¶ 22 (citing 89 Ill. Adm. Code 300.100(a) (2012), and 325 ILCS 5/7.4(b)(3) (West 2010)). If reasonable cause is validated, then a formal investigation into the allegation is commenced by DCFS. See *In re J.C.*, 2012 IL App (4th) 110861, ¶ 22 (citing 89 Ill. Adm. Code 300.110(a) (2012)). Following that formal investigation, DCFS is entrusted to determine whether a child was actually abused and classify the allegation of abuse as "indicated, undetermined, or unfounded." See *id.* (citing 89 Ill. Adm. Code 300.110(i)(2) (2012), and 325 ILCS 5/7.12 (West 2010)); see also *Julie Q. v. Department of Children & Family Services*, 2011 IL App (2d) 100643, ¶ 29. This way, all authority and discretion to investigate reports of abuse or suspected abuse is rightfully left with DCFS and not with the mandated reporter. See 325 ILCS 5/7.3(a) (West 2014); *Dimovski*, 336 Ill. App. 3d at 297 (citing 325 ILCS 5/7.3 (West 2000)); *In re J.C.*, 2012 IL App (4th) 110861, ¶ 22; *Julie Q.*, 2011 IL App (2d) 100643, ¶ 29.

¶ 60 Here, based on my review of the undisputed facts, I conclude that Small received a credible allegation of abuse from Student A. Small knew or should have known, at the time of Student A's allegation, that Student A and Student B were presently in the same class, the two students were discussing the alleged abuse by RV, and Student A was reporting that abuse after requesting and receiving Student B's expressed permission. See *supra* ¶¶ 6-7. I emphasize that Student A reported the alleged abuse by RV after a contemporaneous discussion of the abuse

21

with Student B immediately before going to Small's office. See *supra* ¶¶ 6-7. This was also the second time in December 2014 that Student A and Student B discussed the alleged abuse by RV. See *supra* ¶ 6. Further, Student A is a close personal friend of Student B who alleged abuse that occurred relatively recently, namely, during the prior 2013-14 school year. See *supra* ¶ 7; *Willigman*, 2021 IL App (2d) 200188, ¶ 35. The reported abuse also involved inappropriate text messages and naked pictures exchanged between Student B and RV, such that the details of Student A's report undoubtedly revealed to Small that RV committed abusive conduct and supported the existence of a credible allegation. See *supra* ¶ 7; *Willigman*, 2021 IL App (2d) 200188, ¶ 35.

¶ 61         In light of these undisputed facts, I am unpersuaded that Student A's allegation of abuse should, in any way, be diminished by a perceived bias or grudge toward RV. See *supra* ¶¶ 7, 33. To do so would unnecessarily subject victims of abuse to the risk of not having their allegation of abuse reported based upon a juvenile but common circumstance in high schools—namely, the dislike of a teacher due to the perceived unfair treatment of a student. Diminishing a report of abuse based upon such a circumstance or a presumed "motive to lie" also gratuitously assumes that Student A would take extreme and vindictive action in response to the perceived unfair treatment by RV. See *supra* ¶ 33.

¶ 62         Therefore, I reject the notion that Small needed to speak with Student B or obtain additional information to verify a self-classified "unsubstantiated rumor" or "hearsay" allegation against RV. Student A's allegation was credible and expressly allowed by DCFS's 2015 manual for mandated reporters. See Ill. Dep't of Children & Family Services, *Manual for Mandated Reporters* 8 (May 2015 rev. ed.). Importantly, there is not—and never has been—a requirement

22

that a mandated reporter speak with the alleged victim.[5] See *supra* ¶ 38. Such a requirement would conflict with the plain language of section 4, needlessly burden victims of abuse, and encumber the process for reporting abuse. For these reasons, I conclude that a reasonable person would find Student A's allegation of abuse credible, meaning Small was deprived of the discretion to decide what constituted "reasonable cause to believe" or whether the alleged abuse actually occurred. See *Dimovski*, 336 Ill. App. 3d at 297; *Willigman*, 2021 IL App (2d) 200188, ¶¶ 34-35; Ill. Dep't of Children & Family Services, *Manual for Mandated Reporters* 9 (May 2015 rev. ed.).

¶ 63        Further, while I believe that additional substantiation of Student A's allegation of abuse by RV was unnecessary, I conclude Small did subsequently receive additional information that undoubtedly resulted in "reasonable cause to believe" and sufficient information to "suspect[]" that Student B may have been abused under section 4 and Policy 5:90. Student A's allegation against RV, on its own, was "credible and/or complete." See Ill. Dep't of Children & Family Services, *Manual for Mandated Reporters* 8 (May 2015 rev. ed.). However, in addition to that allegation, Small "observe[d] evidence that some damage was done to" Student B. See *id.* On a continuing basis in the months after Student A's allegation against RV, Small observed or was informed of behavior by Student B that, in retrospect, should have heightened her suspicion of abuse. See *id.* During the relevant time frame, Small became aware of Student B's declining academic performance, discontinued athletic participation, deteriorating attendance, and eventual decision to drop out of school. See *supra* ¶¶ 12-13. Small discussed these issues, on at least three

—————————————

[5]Notably, in the amendments to section 4, effective January 1, 2020, the General Assembly provided, "[n]othing in this Section [4] requires a child to come before the mandated reporter in order for the reporter to make a report of suspected child abuse." 325 ILCS 5/4(c)(2) (West 2020).

occasions, with Student B's mother, who was distraught about Student B's uncharacteristic behavior.[6] See *supra* ¶¶ 12-13.

¶ 64    Despite receiving this information, Small failed to inform Student B's mother or, as was necessary, DCFS of Student A's allegation. All the while, Student B had continued contact with RV in the cafeteria and gymnasium. Further, in January 2015, Student B was assigned to RV's class, where, as retaliation for Student B failing to cooperate with RV's sexual advances and invitation to visit his residence, RV previously treated Student B differently than other female students. RV gave Student B dirty or hateful looks, assigned her extra physical exercises, administered unwarranted discipline, and denied her requests for permission to rent gym clothes. While the record indicates Student B was eventually reassigned to a health and fitness class that was not taught by RV, Student B was still in the same gymnasium where RV was teaching his class. Unsurprisingly, Student B left school before attending the class where she could have contact with RV.[7] After all, it was the justified concern of reprisal from RV that resulted in her reluctance to speak with Small. That reluctance of a victim, predictably fearful of discipline or

---

[6]In the statement of facts contained within the hearing officer's decision, the hearing officer found as follows:

> "Student B's mother had at least three (3) meetings with Small during th[e] timeframe [December 2014 and May 2015] and, at least on one occasion—May 2015, Student B's mother went to Small's office extremely upset and crying about the changes in her daughter. The subject of these meetings, especially the May [2015] meeting, was that Student B, formerly a good student and a good athlete, suddenly stopped playing sports, was frequently absent from school and eventually dropped out of school in the early part of the second semester of the 2014-2015 school term. The purpose of these meetings was that Student B's mother was seeking assistance to determine what had caused the change in her daughter and how to get her daughter back on track."

[7]The hearing officer found, in the statement of facts contained in his decision, as follows:

> "On January 8, 2015[,] Student B turned eighteen and moved in with her boyfriend, another student at the High School. She began having attendance problems in that she would go to all the classes preceding the class being taught by RV. She began not attending RV's class and all the classes following that class. Thereafter, her attendance deteriorated to the point that she was eventually dropped from school by the District."

embarrassment due to a perpetrator's established behavior, should not have been so easily dismissed. Likewise, it was an understandable and foreseeable desire to avoid RV's continued behavior that Student B suffered anxiety and a deteriorating attendance record. Even absent any record of Student A's allegation, which was entirely limited to a "Post-it" note that was subsequently lost, Small should have realized a link between the allegation and Student B's spiraling behavior, prompting a report to DCFS under section 4 and Policy 5:90. See *supra* ¶ 21; Ill. Dep't of Children & Family Services, *Manual for Mandated Reporters* 8 (May 2015 rev. ed.); *Willigman*, 2021 IL App (2d) 200188, ¶ 37.

¶ 65 Finally, contrary to Small's position, the necessary conditions for a DCFS investigation were present when Student A alleged abuse by RV. See Ill. Dep't of Children & Family Services, *Manual for Mandated Reporters* 9 (May 2015 rev. ed.). Student B was under the age of 18, and RV was a person who knew her in an official capacity or position of trust as a teacher. See *id.* Student A also reported specific incidents of abuse or a specific set of circumstances involving suspected abuse—namely, inappropriate text messages and naked pictures exchanged between Student B and RV during the 2013-14 school year. See *id.*; *supra* ¶ 7. Undoubtedly, the allegation by Student A involved a demonstrated harm or substantial risk of sexual injury to Student B in the form of a continuing or escalating inappropriate sexual relationship. See Ill. Dep't of Children & Family Services, *Manual for Mandated Reporters* 9 (May 2015 rev. ed.).

¶ 66 In sum, Small received a credible allegation of abuse from Student A. Further, Small obtained "reasonable cause to believe" and sufficient information to "suspect[]" Student B may be abused under section 4 and Policy 5:90. Since Small failed to report the allegation of abuse to DCFS, I would hold the Board's finding that she violated section 4 and Policy 5:90 was not

clearly erroneous. See *AFM Messenger Service*, 198 Ill. 2d at 392, 395; *FLM Enterprises*, 2020 IL App (3d) 180634, ¶ 22; *Fraternal Order of Police*, 2011 IL App (1st) 103215, ¶ 18.

¶ 67                                     C. Irremediability

¶ 68         First, I conclude that Small's failure to comply with section 4 and Policy 5:90 was irremediable under *Gilliland*. I believe Small contributed to the damage that was done to the students, faculty, and school. See *Gilliland*, 67 Ill. 2d at 153. From Student B's perspective, Small's compliance with section 4 and Policy 5:90 could have severed the in-school contacts between Student B and RV, which could have also avoided Student B's anxiety, deteriorating attendance, and eventual decision to drop out of school. More broadly, Small's noncompliance with section 4 and Policy 5:90 prevented a more timely severance of RV's contact with the high school's students. It is certainly conceivable that Small's conduct contributed to the community's loss of faith in defendants' ability to safeguard students by timely addressing such delicate issues. Indeed, in its decision, the Board referenced the coverage of RV's abuse in the local news and on social media. Similarly, the Board referenced defendants' resulting exposure to liability.

¶ 69         Second, I conclude Small was, in fact, warned about the failure to comply with her mandated obligations under section 4 and Policy 5:90 through her training and education. See *id.* Small's conduct, resulting in the aforementioned damage, would not have been corrected if she had received additional warnings from her superiors. See *id.* Small undisputedly received training on the obligations of a mandated reporter, which are discussed at length in this dissent, and signed an acknowledgment of that status. Yet, Small did not fulfill her obligations under section 4 or Policy 5:90 by reporting Student A's allegation to DCFS. Regrettably, I agree with defendants' sentiment that no additional training could remediate Small's noncompliance with those provisions, which resulted in defendants' loss of confidence in Small's service as a

guidance counselor. Therefore, on this issue, I conclude the Board's decision was not clearly erroneous. See *AFM Messenger Service*, 198 Ill. 2d at 392, 395; *FLM Enterprises*, 2020 IL App (3d) 180634, ¶ 22; *Fraternal Order of Police*, 2011 IL App (1st) 103215, ¶ 18.

¶ 70        For these reasons, I respectfully dissent from the opinion of my respected colleagues in the majority.

## No. 3-21-0113

| | |
|---|---|
| **Cite as:** | *Small v. Board of Education of Streator Township High School District No. 40*, 2022 IL App (3d) 210113 |
| **Decision Under Review:** | Appeal from the Circuit Court of La Salle County, No. 16-MR-237; the Hon. Joseph P. Hettel, Judge, presiding. |
| **Attorneys for Appellant:** | Christopher J. Waple, of Law Offices of Cozzi & Zapf, of London, Kentucky, for appellants. |
| **Attorneys for Appellee:** | James P. Baker, of Baker, Baker & Krajewski, LLC, of Springfield, for appellee. |