NOTICE
Decision filed 06/25/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250010-U

NO. 5-25-0010

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| SANDRA L. DEPPE, Individually, and as Trustee of the Sandra L. Deppe Revocable Living Trust Dated 7/20/22, and TIMOTHY J. DEPPE, Individually, and as Trustee of the Timothy J. Deppe, Revocable Living Trust Dated 7/20/22, | ) ) ) ) ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| Plaintiffs-Appellees and Cross-Appellants, | ) ) | |
| v. | ) ) | No. 23-MR-225 |
| THE VILLAGE OF SWANSEA PLANNING AND ZONING BOARD, | ) ) ) ) | Honorable Leah A. Captain, |
| Defendant-Appellant and Cross-Appellee. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justice Hackett concurred in the judgment.
Justice Vaughan dissented.

**ORDER**

¶ 1   *Held*: The circuit court's order finding that the Village of Swansea is equitably estopped from barring a storage business located at 1958 Llewellyn is reversed. The circuit court's order finding that the Village of Swansea should not be equitably estopped from barring a storage business located on property at 2012 Llewellyn is affirmed.

¶ 2   This case involves two parcels of property purchased by Timothy J. Deppe (Timothy) at different times, that were both eventually transferred into revocable trusts in his name and that of his wife, Sandra L. Deppe, on July 20, 2022. Both parcels were located in the Village of Swansea (Swansea) and were zoned as "Conservation."

1

¶ 3    Timothy initially operated a lawncare business. In 2006, he purchased the first parcel at 1958 Llewellyn. In 2020, Timothy purchased the second parcel at 2012 Llewellyn.

¶ 4    In March 2006, Timothy filed an application for a zoning compliance certificate and a construction permit in which he listed the property's use as commercial in nature. While Swansea defined its "Conservation" to include certain permissible businesses related to open greenspace and parks, commercial use of the parcels in Swansea's "Conservation" district was limited.

¶ 5    Over the years, Timothy sought various construction and zoning permits. For years, Swansea approved applications and requests Timothy made. Many conversations, text messages, and written communication took place between Timothy and numerous Swansea officials about the businesses he operated from the two lots. Neighboring landowners complained about the commercial businesses being operated from those two lots because the neighborhood was agricultural and residential. On more than one occasion, Swansea notified Timothy of the nonconforming use of both lots.

¶ 6    On June 9, 2023, Swansea served Timothy with an order to correct his nonconforming uses of the two Llewellyn lots by June 19, 2023. Shortly thereafter, Timothy shut down his self-storage business.

¶ 7    Timothy appealed Swansea's order, first to the zoning appeal board, which affirmed, and then to the St. Clair County circuit court. After a hearing, the circuit court ruled in Timothy's favor relative to the 1958 Llewellyn property, holding that Swansea was equitably estopped from enforcing the alleged nonconforming uses of that lot. However, the circuit court found in favor of Swansea relative to the 2012 Llewellyn property.

¶ 8    Both parties appeal the circuit court's rulings. For the following reasons, we reverse the circuit court's order regarding 1958 Llewellyn and affirm the circuit court's order regarding 2012 Llewellyn.

¶ 9                                      I. BACKGROUND

¶ 10    Timothy has been in the lawn care business since 1982. In 2006, Timothy purchased a parcel of land in Swansea—1958 Llewellyn.[1] The parcel was zoned by Swansea as "Conservation."

¶ 11    The Village of Swansea Zoning Code defines "Conservation District" as including "areas that are presently undeveloped or sparsely developed and that, for various reasons, should remain so for the foreseeable future." Swansea Zoning Code § 154.070(A) (eff. Mar. 17, 2014). Section 154.070(B) sets out the permitted uses in a "Conservation District," which include agriculture, nurseries, greenhouse, temporary produce stands, cemeteries, government uses of the village, single-family dwellings, public libraries, playgrounds, parks, recreational or community centers or grounds, temporary buildings or trailers for construction purposes, and accessory uses, buildings, and structures. *Id.* § 154.070(B). Section 154.070(C) sets out a complete list of "accessory uses, buildings, and structures" none of which are applicable in this case. *Id.* § 154.070(C).

¶ 12    Since 2006, Timothy made multiple applications for initial zoning compliance and construction permits. Until 2023, Swansea issued permits for all applications filed by Timothy. All permits issued contained requirements for compliance to include changes in plans and/or specifications requiring written approval of the zoning administrator. Compliance with Swansea's codes and ordinances was mandatory.

---

[1]We cannot ascertain from the briefs on appeal if the business was always jointly owned by Timothy J. Deppe and Sandra L. Deppe. However, their revocable living trust dated July 20, 2022, indicates that the properties were at some point transferred into the trust, and that the trust now owns both properties. Throughout this order, we will refer to the owner of these two properties as Timothy J. Deppe (Timothy).

¶ 13    In March 2006, Timothy applied for a certificate for zoning compliance and for a construction permit listing the property's use as "commercial" stating that he was removing certain buildings and replacing them with a "4032 square foot pole barn" building. Timothy did not seek a variance amendment, special use permit, or other legal means to change the conservation district zoning classification. Timothy also executed a "Builder's Statement of Understanding, Acceptance, and Agreement," which affirmed his understanding that Swansea had not granted him a privilege to erect any structure, and agreed that the responsibility of code compliance rested solely with him. Specifically, the statement indicated that Timothy:

> "1. [Timothy] understand[s], accept[s] and agree[s] that any permit issued for any building, electrical, plumbing, mechanical or sewer work, does not grant the privilege to erect any structure or to use any property for a purpose or in a manner prohibited by the adopted code, ordinances or regulations of *** Swansea.

> 2. [Timothy] understand[s], accept[s] and agree[s] that the responsibility for assuring the plans for any proposed construction are in compliance with provisions of the adopted codes, shall rest solely with [Timothy] as the applicant."

¶ 14    Swansea issued a building permit to Timothy on March 20, 2006, for a "Garage, New Building" and a construction permit for a "storage shed." The permit was conditioned on the need that the construction conformed to Swansea's codes and ordinances and that Timothy was responsible to conform to the terms of the permit as follows:

> "This permit is granted on the express condition that construction will conform, in all respects, to the ordinances and codes of *** Swansea, and to the information submitted to [Swansea] as application of this permit. The responsibility for assuring that construction

4

conforms to ordinances, and for assuring that all required inspections are requested and passed, remains with the applicant."

¶ 15    On August 21, 2007, Timothy filed an application for an initial certificate of zoning compliance and an application for construction permits, both of which listed the proposed use and construction plans as "storage buildings." The same limitations regarding Swansea ordinances and codes applied. Swansea issued a building permit for "garage; new building," and issued a construction permit for "storage building." Timothy did not seek a variance to change the "Conservation" zoning classification.

¶ 16    On March 5, 2010, Swansea deputy code administrator, Randy Tedesco (Tedesco), sent Timothy a letter in follow-up to a telephone conversation indicating that storage sheds on the 1958 Llewellyn property violated the permitted use of a conservation district. With this letter, Tedesco included copies of the various ordinances with which Timothy needed to comply "for the purpose of using the storage sheds as a business located at 1958 Llewellyn ***." In closing, Tedesco stated that "use of the property is not permitted within the Conservation District" and that Swansea needed him "to get the property into compliance regarding the structures and the business in a timely [manner]." The record does not reflect that Timothy took action to comply with Swansea's demands, or that Swansea endeavored to enforce compliance with its zoning rules.

¶ 17    On September 15, 2010, the Swansea village administrator, John Openlander (Openlander), responded to a phone request Timothy made on September 13, 2010, for a variation on the 1958 Llewellyn property. Timothy wanted to build additional storage buildings and three residential buildings on that property. Previously, Timothy had advised Swansea that he intended to build one residential building. Openlander stated:

"Regarding the storage buildings now proposed, the area of the buildings would exceed 10,0000 square feet. *** [F]ormer Building and Zoning Director Terry Harp imposed a limit of 10,000 square feet on storage buildings at the site. *** Mr. Harp authorized storage buildings not to exceed that amount of square footage because there were several farm buildings of comparable size, now demolished, constructed on the property prior to your ownership. The storage buildings that you have already built would serve as accessory structures to [a] single family residence that was to be built on the site. ***

The property is currently zoned Conservation District. The description of the intent of the zoning classification and the permitted and special uses allowed within the district are outlined in *** the Swansea Zoning Code. *** The buildings that you propose do not comply with the Zoning Code. You may request a variance from the Village, but the Village Board of Trustees must find that your request meets the criteria for a variance. ***

At this time, it is my understanding that you continue to rent the storage buildings on the site to the public. This use of the buildings at 1958 Llewellyn *** appears to constitute a violation of the Swansea Zoning Code. You were previously notified that such use was a violation of the Zoning Code in a letter from *** Tedesco dated March 5, 2010. I am requesting that you meet with me to discuss this possible zoning code violation within the next thirty days."

¶ 18    The record is silent about whether Swansea held this meeting with Timothy. On October 4, 2010, Timothy applied for both a construction permit (for a "nursery") and an initial certificate of zoning compliance for a new building (listed as "garage" and "nursery"). On October 6, 2010, the building permit was issued and required conformance with the applicable ordinances and codes.

¶ 19    On October 14, 2010, Openlander sent Timothy a letter to discuss his desire to use 1958 Llewellyn as a nursery, stating:

> "A nursery is a permitted use in a Conservation District, which is the zoning classification of the property. It is further understood that you have registered a nursery business with the Building and Zoning Department at that location. It is therefore necessary to comply with parking and signage regulations for such a business."[2]

¶ 20    On September 8, 2013, Timothy e-mailed Swansea with a request to build a new building at 1958 Llewellyn: "I would like to put a new building to house my growing Lawn and Landscaping business. The building that I would like to put up would be 30x88." Then on October 10, 2013, Timothy applied for an initial certificate of zoning compliance for a permit to build a new building (listed as "lawn and landscaping/storage for equipment") and for a construction permit (listed as commercial "storage for lawncare equipment"). Swansea issued the permit on October 11, 2013.

¶ 21    On June 23, 2014, Timothy applied for a construction permit to update the electrical system in one of the buildings. On June 24, 2014, Swansea issued a service upgrade permit for Timothy's "growing lawn and landscaping business." On February 27, 2018, Timothy applied for a building permit for a new building listed as a "garage." On March 2, 2018, Swansea issued its permit. On May 13, 2020, Timothy applied for a building permit with proposed uses listed as "commercial" and "storage buildings." On May 15, 2020, Swansea issued its permit.

¶ 22    Timothy took out a loan to fund the purchase of the adjacent lot—2012 Llewellyn. The loan was obtained at an unspecified date in 2020. On January 18, 2021, he applied for a building

---

[2]Despite this compliance-mandated instruction from Swansea, Timothy failed to include "nursery" in a business registration until 2016 when he classified the business as "Lawn & Landscaping." Starting in 2018 and through the rest of this case, Timothy registered the business as "Tim's Lawn & Landscaping & Nursery."

application for both the 1958 and 2012 Llewellyn properties with the intent of building a "commercial" pole barn. Swansea issued the building permit on January 21, 2021.

¶ 23    On December 17, 2021, Timothy requested another building permit for the 2012 Llewellyn property to construct a "garage" and "storage," both of which were characterized as "commercial." Swansea issued its permit on December 21, 2021.

¶ 24    On January 3, 2022, Timothy submitted a building permit application for demolition of an existing house on the 2012 Llewellyn property, characterized as "commercial." Swansea issued its permit on the same date.

¶ 25    On October 19, 2022, Swansea building and zoning director, Joseph Iliff (Iliff), informed Timothy that the 1958 Llewellyn #B dwelling failed inspection. Iliff listed eight items that required completion before reinspection.

¶ 26    On December 20, 2022, Iliff corresponded with Timothy and denied his application for certification of nonconformance,[3] stating:

"The documents you provided do not establish that the property has been continuously used for residential purposes since its annexation into the Village of Swansea in September 2004. My review of the Village's records of plans, permits, and certificates issued for the property do not indicate the continuous presence of one or more occupied dwellings on the property. I can find no occupancy certificates issued by the Village that would indicate existing dwelling units being occupied since the annexation of the property.

Per Section 154.209(B), a certificate of non-conformance cannot be issued unless the zoning administrator determines that the use lawfully existed prior to the change in the zoning regulations which created the non-conformity. Per Section 143.097(C), when a non-

_____

[3]The date Timothy filed his application for certification of nonconformance is not indicated.

8

conforming use is discontinued for a period of 12 consecutive months, it shall not thereafter be resumed."

In denying the applications for occupancy certificates for the two 1958 Llewellyn residential properties, Iliff indicated that Timothy must discontinue all residential activities on or before January 31, 2023, and that starting on February 1, 2023, Swansea "will consider any residential use of the subject property as a violation of the Swansea Zoning Code and subject to *** penalties *** including the imposition of fines."

¶ 27    From January 2022 until June 2023, Timothy text-messaged Swansea administrator, Ben Schloesser (Schloesser), about various zoning and compliance issues. He spoke to Timothy of possible ways to resolve some issues by reframing the uses of the parcels. In response, Timothy texted back, maybe humorously, asking to be sent a land use permit for his "new trucking business and new dog kennel."

¶ 28    During the later circuit court hearing on these matters, Timothy testified that given his earlier discussions with Schloesser about whether his use of both properties was legally nonconforming, he was "given the impression that [Schloesser] went and confirmed that with the building and zoning director," and that his nonconforming use of the properties was appropriate. He further testified that if he needed to seek a permit for a new trucking business and dog kennel, he would comply.

¶ 29    On March 24, 2023, Schloesser communicated with Timothy about complaints Swansea had received "from neighboring and nearby property owners that the conditions of these two properties and the activities of yourselves and others on them are continuing to have unpleasant and disruptive visual and auditory impacts ***." In addition, Schloesser addressed the storage buildings as follows:

9

"The use of both on-site and off-site storage advertising a 'Tim's Storage' business was also brought up as a concern. The Village of Swansea has not issued a license for such a business at either of these properties. Discontinuing the advertising and identification of such a business would also be an improvement to the conditions of the property."

¶ 30 On May 12, 2023, Swansea zoning administrator, Iliff, sent Timothy a corrective action order by mail. However, because Timothy did not accept mail service of the order, Swansea directly served him with a copy on June 9, 2023, ordering him to correct his violations regarding both properties by June 19, 2023. At issue was the "Conservation" zoning classification for the two lots. The order stated that Swansea's "[i]nspections of the properties *** found the operation of a mini-warehouse (self-storage) business (Tim's Storage)," which is "not permitted with the C-Conservation District." Swansea ordered Timothy to correct the violation "by ending all mini-warehouse (self-storage) land uses and associated businesses of its tenants," including "the removal of property and vehicles stored on site now owned by you as the owners of the properties, and the discontinuance of any leases and/or rental agreements for use of the properties for the storage of [personal] property or vehicles by others." In conclusion, Swansea stated that it was reserving its rights to enforce provisions of the safety code: "Inspection of the properties has also found multiple buildings that may not conform to the requirements of the *** Conservation District of the Swansea Zoning Code and/or the requirements of the applicable building and life safety codes."

¶ 31 On or about June 20, 2023, Timothy voluntarily closed his self-storage business in response to Swansea's order. The self-storage business remained closed as of the date that the briefs were filed in this appeal.

10

¶ 32    On July 20, 2023, Timothy appealed Iliff's zoning administration order, indicating that the businesses he operated were "Lawn Care Business" and "Self-Storage." Swansea held its zoning appeal hearing on August 29, 2023. Multiple witnesses testified at this hearing.

¶ 33    Timothy testified that he had operated a lawn care business since 1982 and had later operated "Tim's Storage" on the Llewellyn properties. He acknowledged that he had never made a business registration for the storage business, but that he did have a sign on the building, a website, and a Yelp review page. Timothy admitted that the conservation zoning category for the two properties did not permit a self-storage business. However, he testified that before he purchased the 1958 Llewellyn property in 2006, he met with the then-administrator for Swansea, Terry Harp (Harp), to inquire about a storage business. He claimed that Harp told him that he could build storage buildings if he first tore down the existing dilapidated buildings. Relying upon Harp's statements to him, and after removing said dilapidated buildings, Timothy testified that every permit he sought was approved by Swansea.

¶ 34    Timothy testified that his March 20, 2006, construction permit for 1958 Llewellyn stated that any construction he undertook would conform to Swansea codes and ordinances. Timothy testified that he did not know the procedures for zoning applications, and he never looked at, or considered, the applicable procedures.

¶ 35    Timothy also testified that following a Swansea village board meeting with board representatives, Openlander and Skip Kernan (Kernan), he was informed that if he built berms, planted pine trees, and added a rocked parking area to his property,[4] he could continue with his storage business.

---

[4]The date of this meeting is not stated in the briefs or record on appeal, but contextually given questions Timothy was asked both before and after this question during his later in-court testimony, the meeting with Openlander and Kernan likely occurred between 2006 and 2010.

¶ 36    Timothy confirmed that he never filed a request for a variance as referenced in Openlander's September 15, 2010, correspondence with him. Through this testimony, he acknowledged that despite Swansea's continued issue with his compliance with the law and ordinances, he never researched the applicable law and ordinances.

¶ 37    Schloesser testified that he was Swansea's administrator responsible for overseeing daily operations, including planning and zoning. He clarified his January 12, 2022, text message to Timothy stating that he asked a man named "Joe," who also worked for Swansea, about legal nonconforming uses for these properties. He indicated that Timothy believed that somehow his property was "grandfathered in" from the prior owner and thus could remain nonconforming. Schloesser testified that he did not believe that after a property transferred ownership that its former owner's legal nonconforming usage could be transferred to the current owner. However, in speaking with Joe, he confirmed that the legal nonconforming usage could transfer to the new owner. However, Schloesser testified that if he had informed Joe that he was talking specifically about Timothy's properties, he believed Joe would have told him the opposite answer—that Timothy's properties would *not* be grandfathered in. Overall, Schloesser testified that he was "trying to resolve issues like these amicably" and that he did not have the authority to confer approval of usages of the property. Regarding Timothy's claim that he believed he could structure the usage to include a trucking business and a dog kennel, Schloesser testified that he would not have told any resident, particularly Timothy, to make an application for a specific type of business. He characterized the conversation he had with Timothy as being about Timothy's nonconforming uses of the property and testified that he informed Timothy that usage of the Llewellyn lots needed to be in conformity with the zoning classification, which could mean that he needed to have a different type of business at the properties.

12

¶ 38    Christina Grieve (Grieve), a commercial real estate appraiser, next testified at the August 29, 2023, Swansea meeting. She testified that she was hired twice by the Bank of Belleville to perform appraisals of the 1958 Llewellyn property. Before she conducted the appraisals in 2016 and 2020, she confirmed zoning requirements regarding the 1958 Llewellyn property. In 2016, Grieve testified that she contacted Swansea "zoning officials" who confirmed that the property was in a zoned conservation district, that the residential apartments on the property were illegal, and that self-storage units were a legal nonconforming use of the property. In 2020, Grieve repeated the process, and someone in the Swansea zoning department again told her that the storage units were a legal nonconforming use. She stated that because Timothy's property was a legal nonconforming use, she never requested written zoning documentation or other verification from Swansea.

¶ 39    Dallas Alley (Alley) was Swansea's director of building and zoning from November 2017 until September 2021. Alley submitted a written statement for inclusion at the administrative appeal hearing. Alley was the primary Swansea official on issues related to construction and zoning administration. In a statement, he indicated that although he had worked with the appraisal company which employed Grieve, he had never been specifically contacted by Grieve or her office about Timothy's properties. Almost all inquiries from that company would come via e-mail. It was his experience that this appraisal company would request such information in writing for verification purposes.

¶ 40    Several of Timothy's neighbors testified or made comments at the zoning appeal hearing about Timothy's actions related to the properties as well as the businesses operating therefrom. A neighbor who lived adjacent to the properties stated that Timothy "destroyed the neighborhood." More specifically, as the lots were unpaved, there were dust and erosion issues. Lance Schanter, a

13

neighbor, stated that the issue was the commercial nature of the businesses on the properties "in the heart of an agricultural and a residential neighborhood." A complaining neighbor, Dennis Mernick, testified that when building first started on the lots, Alley, a Swansea zoning administrator, told him that there was nothing that could be done about the Llewellyn properties.

¶ 41 On August 30, 2023, the Swansea Planning and Zoning Board (Board) affirmed the planning and zoning administrator's decision. The Board noted that in 2010, Timothy had a meeting with some former Swansea officials to discuss issues Swansea had raised about Timothy's use of 1958 Llewellyn. While the 2010 meeting details were in dispute, after the meeting, Timothy continued to operate his self-storage business.

¶ 42 The Board's order stated:

"After due consideration, the majority finds, and Appellant does not dispute, that the use of the Appellants' property at 1958 Llewellyn and 2012 Llewellyn does not comply with the property zoning of the Conservation. The majority further finds that a certificate of non-conforming use for the property was never issued by the Zoning Administrator. Further, appellants have failed to sustain their burden of proof on the issue of estoppel. The June 9, 2023[,] decision of the Zoning Administrator is AFFIRMED."

¶ 43 Timothy filed a complaint in St. Clair County on October 3, 2023, against the Board to appeal its decision finding that his use of the two Llewellyn properties failed to conform to its conservation zoning classification. A hearing on Timothy's complaint was held on October 3, 2024. The court took the matter under advisement and entered its order on December 23, 2024.

¶ 44 In the circuit court's December 23, 2024, order, the court reversed Swansea's decision relative to 1958 Llewellyn based on equitable estoppel finding that Timothy had established all three required prongs—(1) Swansea affirmatively allowed the changes Timothy made to the

14

property, (2) Swansea's affirmative acts of allowing those changes induced substantial reliance by Timothy, and (3) Timothy substantially changed his position as a result of his justifiable reliance. However, the court found that Timothy did not have the same supporting testimonial evidence regarding 2012 Llewellyn and affirmed the Board's order that Timothy's use of that property was not in conformity with the conservation zoning classification.

¶ 45    Swansea appeals from the circuit court's estoppel order regarding 1958 Llewellyn. Timothy cross-appeals from the circuit court's order denying his estoppel claim regarding 2012 Llewellyn.

¶ 46                                    II. ANALYSIS

¶ 47    On appeal from the St. Clair County circuit court's order, we must initially determine the appropriate standard of review. We find that the standard of review " 'depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact.' " *PepsiCo, Inc. v. Department of Revenue*, 2025 IL App (1st) 230913, ¶ 34 (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001)).

¶ 48    " 'An administrative agency's decisions on questions of fact are entitled to deference and are reversed only if against the manifest weight of the evidence.' " *Id.* ¶ 35 (quoting *Hormel Foods Corp. v. Zehnder*, 316 Ill. App. 3d 1200, 1204 (2000)). However, " '[a]n administrative agency's decisions on questions of law are not afforded deference and thus are reviewed *de novo*.' " *Id.* ¶ 36 (quoting *Most Worshipful Grand Lodge of Ancient Free & Accepted Masons of Illinois v. Department of Revenue*, 378 Ill. App. 3d 1069, 1074 (2007)). Finally, " '[m]ixed questions of fact and law, which involve the application of law to a particular set of facts, are subject to review under the clearly erroneous standard ***.' " *Id.* ¶ 37 (quoting *Zebra Technologies Corp. v. Topinka*, 344 Ill. App. 3d 474, 480-81 (2003)). "This standard of review lies somewhere between

15

manifest weight of the evidence and *de novo*, allowing deference to an agency's experience and expertise." *Id.* With the clearly erroneous standard of review, the agency's decision will not be reversed unless " 'the reviewing court, on the entire record, is "left with the definite and firm conviction that a mistake has been committed." ' " *Id.* (quoting *AFM Messenger Service*, 198 Ill. 2d at 395, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 49 Having reviewed the Swansea Board's order, we conclude that the order contained a mixed question of fact and law, and thus our review is pursuant to the clearly erroneous standard. With this mixed standard, we find that we must determine the legal effect of the given set of facts at issue. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). We will not reverse the agency's decision unless we determine that the agency committed a mistake based on the entire record. *AFM Messenger Service*, 198 Ill. 2d at 395 (quoting *United States Gypsum Co.* 333 U.S. at 395).

¶ 50 "The trial court's decision regarding equitable estoppel will not be disturbed on review unless it is against the manifest weight of the evidence." *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, ¶ 33 (citing *Feiler v. Covenant Medical Center of Champaign-Urbana*, 232 Ill. App. 3d 1088, 1093 (1992)). Alternatively, a trial court's equitable estoppel decision will be reviewed on a *de novo* basis if it is based on a legal conclusion. *Id.* (citing *In re Marriage of Jungkans*, 364 Ill. App. 3d 582, 584 (2006)). Regardless of the standard for review, Swansea maintains the burden to demonstrate that the circuit court's application of equitable estoppel is erroneous. See *Sherwood Commons Townhome Owners Ass'n v. Dubois*, 2020 IL App (3d) 180561, ¶ 18 (citing *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 132 (1976)).

16

¶ 51    Here, the circuit court determined that the doctrine of equitable estoppel applied. The circuit court's order was based on the facts of Timothy's interactions and his reliance upon statements made by various Swansea officials. Thus, we find that the circuit court's order was not based solely on a legal conclusion. *Id.*

¶ 52    The doctrine of equitable estoppel may be applied against an agency like the Swansea Planning and Zoning Board, although use of the doctrine is not favored. *FLM Enterprises, LLC v. Peoria County Zoning Board of Appeals*, 2020 IL App (3d) 180634, ¶ 26 (citing *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, ¶ 33). "Courts will apply equitable estoppel against a public body if the aggrieved party can show that (1) the government entity affirmatively acted, (2) the affirmative act induced substantial reliance, and (3) the aggrieved party substantially changed its position as a result of its justifiable reliance." *Id.* The affirmative act required for equitable estoppel could be "an act by the municipality itself or by an official with express authority to bind the public entity." *Id.* (citing *Patrick Engineering, Inc. v. City of Naperville*, 20112 IL 113148, ¶ 39). Additionally, "[t]he reliance must be detrimental and reasonable." *Id.*

¶ 53    To determine if a party's reliance was reasonable, the "court must consider all the facts the party knew, as well as those that the party could have discovered through the exercise of ordinary care." *Id.* ¶ 27 (citing *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 456 (2004)). Whether or not the reliance was reasonable is a question of fact. *Siegel Development, LLC v. Peak Construction, LLC*, 2013 IL App (1st) 111973, ¶ 114. However, if only one conclusion can be drawn from the undisputed facts of the case, the question is legal and it is for the court to decide. *Id.* (citing *Doe v. Dilling*, 371 Ill. App. 3d 151, 174 (2006)). " ' "Illinois law has long held that, where the representation is made as to a fact actually or presumptively within the speaker's knowledge, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely

upon it without investigation, even though the means of investigation were within the reach of the injured party and the parties occupied adversary positions toward one another." ' " *Id.* (quoting *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 709 (2002), quoting *Sims v. Tezak*, 296 Ill. App. 3d 503, 511 (1998)). If the party's reliance is considered unreasonable given the available information, "the loss is considered his own responsibility." *D.S.A. Finance Corp. v. County of Cook*, 345 Ill. App. 3d 554, 561 (2003) (citing *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 575 (1998)).

¶ 54    Swansea argues that Timothy cannot rely upon actions or statements made or omitted by Swansea because he knew, or should have known, that his storage business violated Swansea code. We agree. There is no question that Timothy was obligated to comply with Swansea's zoning rules. Though notices and violation warnings had years earlier been communicated to Timothy, Swansea's enforcement action against Timothy's use of the Llewellyn lots began in May 2023 when it informed Timothy that pursuant to its inspection of the lots, it "found multiple buildings that may not conform to the requirements of the *** Conservation District of the Swansea Zoning Code and/or the requirements of the applicable building and life safety codes."

¶ 55    Overall, we must determine if Timothy's reliance on the property and conservation zoning status information he claims to have received from multiple Swansea officials from 2006 until the early 2020s, was reasonable. *FLM Enterprises, LLC*, 2020 IL App (1st) 091240, ¶ 27 (citing *Tirapelli*, 351 Ill. App. 3d at 456).

¶ 56    Timothy does not dispute or deny that compliance with Swansea's codes and ordinances is mandatory. In March 2006, he applied for a certificate of zoning compliance and executed his "Builder's Statement of Understanding, Acceptance, and Agreement" by which he affirmed his understanding that he was responsible to comply with applicable code. In that agreement, it states

18

that he understands, accepts, and agrees "that any permit issued for any building, electrical, plumbing, mechanical or sewer work, does not grant the privilege to erect any structure *or to use any property for a purpose or in a manner prohibited by the adopted code*, ordinances or regulations of the Village of Swansea." (Emphasis added.) In each new application over the years, in 2007, 2010, 2014, 2020, 2021, and 2022, he executed the same agreement.

¶ 57    Here, we must address a misapprehension of material issues in this case, apparently adopted by the dissent herein. A clarification is required to point out that the village zoning code addresses two issues: construction and usage. A permit to construct within a zoning district may be issued initially as an approval of a proposed building as being construction permitted within the zone and for a usage, as apparent at that time, not contrary to zoning restrictions. It is not an approval for any later ultimate use which would be contrary to the zoning restrictions. For example, an application to construct a gas station could not be approved as it would obviously violate particular zoning restrictions. However, a more generic building description such as storage building, garage, or storage for equipment would appear to be within the zoning restrictions and be permitted. If at such time that the generic building was to be used in a manner contrary to the allowed usages under the codes, such as use as a gas station or, as in our case, publicly rented storage units, a violation would occur.

¶ 58    Timothy was abundantly aware that the two Llewellyn properties were zoned "Conservation." From 2006 to 2023, he never sought to have the zoning classification changed. As the applicant builder, it was Timothy's responsibility to ensure that construction and use conformed to applicable ordinances and the zoning classification.

¶ 59    On August 21, 2007, Timothy began the process of applying for necessary permits to construct "storage buildings." While it is unclear why Swansea did not determine earlier that these

19

"storage buildings" were being used contrary to zoning restrictions, on March 5, 2010, Tedesco spoke with Timothy by telephone and then mailed him a letter to advise him that the storage sheds on 1958 Llewellyn were in violation of the conservation zoning designation, because the storage buildings were being operated as a commercial storage business. Based upon the record on appeal, Timothy opted not to comply with Swansea's demands.

¶ 60    On September 15, 2010, Openlander interacted with Timothy in response to his request to build additional storage buildings and three residential buildings on 1958 Llewellyn. Openlander explained that Timothy was constrained to a limit of 10,000 square feet of developed storage buildings but suggested that storage buildings already on the property could "serve as accessory structures to [a] single family residence" that had been originally planned for that site. Openlander advised Timothy that his rental of these storage buildings was a violation of the Swansea Zoning Code and reminded him that he had previously told Timothy he was out of compliance on March 10, 2010.

¶ 61    In May 2020, Timothy applied for a permit which Swansea granted for "storage buildings." In December 2021, Timothy requested and obtained approval to construct a building described as "garage, commercial, storage" on 2012 Llewellyn. Then in December 2022, Iliff denied Timothy's application for a certification of nonconformance relative to residential uses, stating that Timothy could not establish that the 1958 Llewellyn property had been continuously used for residential purposes since Swansea annexed it in 2004.

¶ 62    We are aware that several Swansea officials communicated with Timothy to establish compliance with the conservation-zoned properties. In 2022 and 2023, Timothy communicated with Schloesser about ways to reframe the nature of Timothy's use of the two parcels so that he would be in compliance. Timothy later testified that he assumed his conversations with Schloesser

20

about the nonconforming use of the properties somehow resulted in approval of his nonconforming use by the building and zoning director. We find no evidence that would justify that assumption. By May 2023, Swansea sent Timothy a corrective action order giving him until June 19, 2023, to correct the zoning violations, and specifically ordering him to discontinue his self-storage business.

¶ 63    In his appeal of the zoning administration order, Timothy specifically acknowledged that the conservation zoning category for both Llewellyn properties did not permit a self-storage business. However, he claimed that Swansea employee, Harp, told him early on he could have a self-storage business if he first tore down the dilapidated buildings that were on 1958 Llewellyn at the time of his original purchase. However, there was no evidence proving these statements or any record of an official act by Swansea. Similarly, Timothy alleged that soon after he purchased 1958 Llewellyn, he had a conversation with Openlander and Kernan, who advised that his nonconforming use of the land for a storage business would be allowed if he simply built berms, planted pine trees, and added a rocked parking lot. Timothy provided no evidence supporting this claim. We note that any such conversation was well before any construction of most of the new buildings occurred and took place at a time when the old buildings were being demolished and new construction was starting. This also substantiates that Timothy had knowledge early on that a storage business was an unpermitted use of the property as contrary to the zoning regulations. Additionally, we note that while commercial real estate appraiser, Grieve, asserts that she was informed by an unidentified Swansea official that the storage business constituted a legal nonconforming use, Timothy provided no evidence to confirm the accuracy of her testimony. In fact, village official Alley contradicts the claim in having no memory of it or any formal act by the village confirming it.

¶ 64     During this Swansea Planning and Zoning Board hearing, the following exchanges occurred:

"MR. DULSKI [SWANSEA VILLAGE BOARD MEMBER]: So, Mr. Deppe, thank you. So as early as 2006 you're applying for building permits, and the stated purpose is storage of equipment, storage of equipment likely related to the lawn businesses, was your statement earlier.

MR. DEPPE: Correct.

MR. DULSKI: Now, the buildings were always the individual garage doors fully intended for rental to the public for commercial use.

MR. DEPPE: Not at that—The first building was not, no.

MR. DULSKI: So for your lawn business, you built a building with individual compartmentalized garage doors and never had any intent to rent those to the public or— for space.

MR. DEPPE: Not on the first building, no.

MR. DULSKI: How about the second building?

MR. DEPPE: Yes.

MR. DULSKI: And on your application, that again was for storage.

MR. DEPPE: For storing equipment.

MR. DULSKI: And the third one.

MR. DEPPE: Yes.

MR. DULSKI: So—And the nursery.

MR. DEPPE: Yes.

22

MR. DULSKI: So all along you're applying for storage not explicitly laid out as public storage. Was your intent all along to rent the storage to the public?

MR. DEPPE: Yes.

\* \* \*

MR. CHAPMAN [SWANSEA VILLAGE BOARD MEMBER]: Okay. And these buildings, do they all have interior partitions between the doors?

MR. DEPPE: Some do, some don't.

MR. CHAPMAN: And they were added in the beginning or added later?

MR. DEPPE: They were added later, but as needed as well.

MR. KOESTERER [VILLAGE OF SWANSEA BOARD MEMBER]: So you said partitions were added later, so necessarily a building inspector looking at that wouldn't have known that you were going to use it for self-storage.

MR. DEPPE: I added them as I needed them. Some were put in right away, some weren't."

¶ 65    Compliance with the zoning mandates of Swansea remained with Timothy, who testified that he did not know the procedures for zoning applications, and he never looked at or considered the process to modify the zoning classification. Ignorance of the law is not a valid excuse. See *Perkins v. Collette*, 179 Ill. App. 3d 852, 860 (1989) (citing *Kazwell v. Reynolds*, 250 Ill. App. 174, 178 (1928) (where a real estate purchaser's complaint was dismissed because his planned commercial use of the real estate was not allowed as the property was zoned residential, and the court emphasized that ignorance of the law is not an excuse)). Neither is ignoring the law. This is particularly true where multiple statements are signed with every building permit application that clearly states that no authority is granted to erect or use any building in a manner prohibited by

23

codes. On all of the multiple building applications filed by Timothy, which included the proposed use of the building, never once was the term "public rental storage" used or a similar purpose identified. In all applications filed, a question was asked, "Has any variation, special use permit, or rezoning been granted for this property?" Twice the answer was left blank; seven times "no" was marked.

¶ 66    We may take issue with how Swansea handled these zoning-based issues in that they would issue warnings, violation notices, and threats, with seemingly little follow-up until Swansea's enforcement action in 2023. However, Swansea's slow enforcement action does not constitute affirmative action supporting Timothy's estoppel claim. *FLM Enterprises, LLC*, 2020 IL App (3d) 180634, ¶ 33.

¶ 67    Use of estoppel requires an analysis of whether the party seeking estoppel could have discovered facts through the exercise of ordinary care. *Id.* Here Timothy willfully acknowledged that he did not seek further information about whether his storage business could be made permissible in the conservation zone and made no effort to seek a change of zoning classification for his properties, even after being informed of improper zoning compliance.

¶ 68    Having reviewed the record and briefs on appeal and having considered the oral argument of the parties, we do not find that Swansea affirmatively acquiesced to Timothy's self-storage business at 1958 Llewellyn. See *id.* ¶ 26 (citing *Morgan Place of Chicago*, 2012 IL App (1st) 091240, ¶ 33).

¶ 69    We also conclude that to support his equitable estoppel claim, Timothy could not have substantially and justifiably relied upon the purported information he received from Swansea officials. He has acknowledged that he knew that a self-storage rental business was not a permitted use in a conservation zone. He was informed on more than one occasion that his storage business

24

was not in compliance with the conservation zoning classification. Despite being told his business did not comply with the zoning restrictions, Timothy ignored the entreaties of Swansea officials and took no steps to comply. *Id.*

¶ 70    While there is no question that Timothy expended great sums of money in furtherance of his self-storage business on both Llewellyn lots, we do not find that his "reliance" was justified. *Id.*

¶ 71    We conclude that the circuit court's determination that the doctrine of equitable estoppel applied relative to 1958 Llewellyn is erroneous and is contrary to the manifest weight of the evidence. *Morgan Place of Chicago*, 2012 IL App (1st) 091240, ¶ 33 (citing *Feiler*, 232 Ill. App. 3d at 1093).

¶ 72    We also conclude that the circuit court's determination that Timothy failed to establish equitable estoppel relative to 2012 Llewelleyn was correct. As stated earlier in this order: "Courts will apply equitable estoppel against a public body if the aggrieved party can show that (1) the government entity affirmatively acted, (2) the affirmative act induced substantial reliance, and (3) the aggrieved party substantially changed its position as a result of its justifiable reliance." *FLM Enterprises*, 2020 IL App (3d) 180634, ¶ 26 (citing *Morgan Place of Chicago*, 2012 IL App (1st) 091240, ¶ 33). Swansea informed Timothy that his business did not comply with the zoning classification. Timothy chose to ignore Swansea's demands that he cease the operation of his commercial storage business. While Swansea could have sought enforcement years earlier than it did, its late enforcement of this zoning code violation does not equate to equitable estoppel, as we find that the government entity did not act officially and affirmatively, and any claimed reliance by Timothy is not justifiable under the circumstances herein.

¶ 73    We conclude that the insufficient and unconvincing facts that fail to support a finding of

estoppel relative to 1958 Llewellyn also are determinative as to 2012 Llewellyn. We affirm the

circuit court's order that Timothy's use of 2012 Llewellyn was not in conformity with the

conservation zoning classification.

¶ 74    Timothy alternatively argues that Swansea is guilty of *laches*, and thus his noncompliant

self-storage business should be allowed. *Laches* is a defense

> "asserted against a party who has knowingly slept upon his rights and acquiesced for a
>
> great length of time, and its existence depends upon whether, under all the circumstances
>
> of a particular case, a party is chargeable with want of due diligence and failing to institute
>
> proceedings before he or she did." *La Salle National Bank v. Dubin Residential*
>
> *Communities Corp.*, 337 Ill. App. 3d 345, 350-51 (2003) (citing *Pyle v. Ferrell*, 12 Ill. 2d
>
> 547, 552 (1958)).

We consider the following four elements in determining whether *laches* applies in this case:

> " ' "(1) [c]onduct on the part of the defendant giving rise to the situation of which
>
> complaint is made and for which the complainant seeks a remedy; (2) delay in asserting
>
> the complainant's rights, the complainant having had notice or knowledge of defendant's
>
> conduct and the opportunity to institute a suit; (3) lack of knowledge or notice on the part
>
> of the defendant that the complainant would assert the right on which he bases his suit[;]
>
> and (4) injury or prejudice to the defendant in the event relief is accorded to the
>
> complainant or the suit is held not to be barred." ' " *Id.* at 351 (quoting *Slatin's Properties,*
>
> *Inc. v. Hassler*, 53 Ill. 2d 325, 330 (1972), quoting *Pyle*, 12 Ill. 2d at 553).

¶ 75    Having reviewed the facts of this case, including the attempts Swansea made to enforce its

zoning rules and Timothy's disregard of those enforcement attempts, we do not find that the

26

doctrine of *laches* applies. Timothy chose to ignore the zoning restrictions upon the properties he purchased as well as Swansea's written notifications and orders that he discontinue his impermissible noncompliant usage.

¶ 76                                                  III. CONCLUSION

¶ 77    For the above reasons, we reverse the St. Clair County circuit court's order in part holding that the Village of Swansea is equitably estopped from barring a storage business located at 1958 Llewellyn and affirm the court's order in part holding that Swansea should not be equitably estopped from barring a storage business located at 2012 Llewellyn.

¶ 78    Affirmed in part and reversed in part.

¶ 79    JUSTICE VAUGHAN, dissenting:

¶ 80    I respectfully disagree with my colleagues' reversal of the circuit court's order addressing the 1958 Llewellyn property, affirmation of the circuit court's order addressing the 2012 Llewellyn property, and finding that neither the equitable doctrine of estoppel nor *laches* apply. It is my opinion that both doctrines require this court to order the Village of Swansea to issue certificates of nonconformance for both properties.

¶ 81    The doctrine of equitable estoppel and its application to facts is well established. The Illinois Supreme Court previously explained that,

> "The general rule is that where a person by his or her statements and conduct leads a party to do something that the party would not have done but for such statements and conduct, that person will not be allowed to deny his or her words or acts to the damage of the other party." *Geddes v. Mill Creek Country Club,*

27

*Inc.*, 196 Ill. 2d 302, 313 (2001) (citing *Dill v. Widman*, 413 Ill. 448, 455 (1952);

*Bondy v. Samuels*, 333 Ill. 535, 545 (1929)).

¶ 82    The elements of the doctrine of equitable estoppel are set forth above but bear repeating here. "Courts will apply equitable estoppel against a public body if the aggrieved party can show that (1) the government entity affirmatively acted, (2) the affirmative act induced substantial reliance, and (3) the aggrieved party substantially changed its position as a result of its justifiable reliance." *FLM Enterprises, LLC v. Peoria County Zoning Board of Appeals*, 2020 IL App (3d) 180634, ¶ 26; *Geddes*, 196 Ill. 2d at 313-14. The affirmative act required for equitable estoppel could be "an act by the municipality itself or by an official with express authority to bind the public entity." *FLM Enterprises, LLC*, 2020 IL App (3d) 180634, ¶ 26 (citing *Patrick Engineering, Inc. v. City of Naperville*, 20112 IL 113148, ¶ 39). Additionally, "[t]he reliance must be detrimental and reasonable." *Id.*

¶ 83    "[T]he representation need not be fraudulent in the strict legal sense or done with an intent to mislead or deceive." *Geddes*, 196 Ill. 2d at 314 (citing *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 148 (1986)). The Illinois Supreme Court also requires consideration of the following long-standing corollary:

> " 'Estoppel may arise from silence as well as words. It may arise where there is a duty to speak and the party on whom the duty rests has an opportunity to speak, and, knowing the circumstances, keeps silent. [Citations.] It is the duty of a person having a right, and seeking another about to commit an act infringing upon it, to assert his right. He cannot by his silence induce or encourage the commission of the act and then be heard to complain.' " *Id.* (quoting *Bondy*, 333 Ill. at 546).

¶ 84 Here, the majority relies on the fact that Timothy could have reviewed the village ordinances but did not. However, the evidence revealed that every time Timothy applied for a permit, he spoke with the zoning administrator and was advised that placement of the building would be allowed before the building was placed. The majority also seems to imply that Timothy's testimony was not credible regarding statements from the zoning administrator addressing the initial demolition of the turkey farm buildings, as well as later performing improvements to the property requested by the zoning administrator to mollify the nearby residential home owners, to which Timothy complied. However, no credibility finding was made by the Board. In fact, based on the testimony as a whole, the Board members accepted Timothy's testimony regarding the statements from the zoning administrators and expressed concern with the changed position.

¶ 85 The Board asked questions after the testimony concluded. The questions addressed the village ordinances at the time Timothy purchased the property, if the houses existed prior to Timothy's purchase of the property, and the difference between an initial and final certificate of conformity. The Board also expressed concern about the zoning administrators granting eight applications when "at least one of the two parties," either the Village of Swansea or Timothy, "knew that there was some issue with the zoning here." One Board member noted concern "especially after 2010" when the village determined there was an issue with the zoning and stating, "I'm confused of why we would allow this." After noting Iliff's comments about the ordinances the Board also stated, "But this definitely doesn't seem like this is the right way to apply this." The Board also addressed whether a variance could be issued and one member compared the situation to buying an imported car and not being able to drive it once it arrived. Another Board member addressed offering stipulations that would appease the neighbors. As such, it is my impression that

29

the majority decision—that is based solely on estoppel—misrepresents the tone of the proceedings and credibility rulings related to Timothy's testimony.

¶ 86    While, admittedly, not all of Timothy's testimony regarding the turkey farm and the 2010 improvements was supported by additional documentation, his testimony about the zoning administrator's actions was supported by the documentation issued by the village administrator. This is seen, most notably, in repeated issuance of initial certificates of zoning compliance that further revealed that final inspections were performed on the building, which indicated the property "passed" the inspection. While the majority relies on the "Builder's Statement" agreeing to comply with the zoning code, personally, I find the Village of Swansea ordinances more reliable.

¶ 87    In addition to the ordinances cited by the majority, the Village of Swansea zoning ordinance specifically states that, "An initial certificate of zoning compliance is issued by the zoning administrator and indicates that he or she has reviewed all plans for a proposed development and found those plans to be in compliance with the provisions of this chapter, thereby authorizing the applicant to proceed with securing all required building permits." Swansea Zoning Code § 154.207(A) (Prior Code § 20-1514). Notably, that section was not part of the March 17, 2014, ordinance revisions and stems from the prior code applicable when Timothy initiated his storage shed business in 2006. The "application" section of this portion of the ordinance reveals similar language stating, "If the zoning Administrator finds that the plans, as submitted, comply with all provisions of this chapter, he or she shall issue an initial certificate of zoning compliance, thereby authorizing the applicant to proceed with securing all required building permits." *Id.* § 154.207(C)(1)(a) (Prior Code § 20-1516).

¶ 88    The Village of Swansea ordinances also provide that an initial certificate of zoning compliance is a "permit issued by the Zoning Administrator indicating that a proposed lot,

30

structure or use is in conformity of the requirements of this chapter." *Id.* § 154.018(B) (Ord. 1812, passed Mar. 5, 2018). A conforming building or structure is defined as one "which complies with all the regulations of this chapter or of any amendment hereto governing bulk for the zoning district in which such building or structure is located." *Id.* A conforming use is "[a]ny use which occupies a building, structure or lot and which complies with the regulations of this chapter or of any amendment hereto governing permitted and special uses for the zooming district, in which such uses are located." *Id.*

¶ 89    Based on those ordinances, as well as the ordinance addressing the zoning administrator's duties and responsibilities, the issuance of the initial certificate of zoning compliance required the Village of Swansea zoning administrator, not Timothy, to determine whether the building requested, and eventually placed on the property, was proper for the zoning area. See *id.*; see also *id.* § 154.202(D)(2) (Ord. 1699, passed Mar. 17, 2014) (The zoning administrator duties are "[t]o review all applications for initial and final certificates of zoning compliance, determine compliance with the provisions of this chapter, notify the applicant of any matters of non-compliances and issue initial and final certificates of zoning compliance when appropriate.").

¶ 90    Further, the issued initial certificates of conformance confirm that a Village of Swansea zoning employee twice inspected the properties after they were built and found that the buildings passed inspection. It is my opinion that Timothy's reliance on the repeated and continued issuance of certificates of conformance was reasonable because it was the zoning administrator's authority to make the zoning determination and, pursuant to the ordinance language, they clearly found the zoning proper. I agree with the majority in stating that Timothy should have reviewed the ordinances. However, to expect a citizen to know more about the zoning ordinances than the zoning administrator is contrary to common sense and also contrary to the ordinances which

31

include in the zoning administrator duties to "provide information to the general public on matters related to this chapter, assist them in understanding its provisions and assist them in any application process" and "review the provisions of this chapter and render decisions on matters relative to those provisions." *Id.* § 154.202(D)(1), (4).

¶ 91 I find the facts in this case are similar to those in the decisions issued in *FLM Enterprises, LLC*, 2020 IL App (3d) 180634, and *County of Du Page v. K-Five Construction Corp.*, 267 Ill. App. 3d 266 (1994). In both cases, the residents relied on oral representations by the zoning authority to purchase property and install a business on said property. See *K-Five Construction*, 267 Ill. App. 3d at 268-69, 273-75; *FLM Enterprises, LLC*, 2020 IL App (3d) 180634, ¶¶ 30-35. In both instances, the appellate court found that estoppel was shown. *Id.*

¶ 92 Here, the factual evidence is even more compelling. It was undisputed that the Village of Swansea zoning administrators repeatedly granted Timothy authority to place additional buildings on the two pieces of property from 2007 to 2022, despite the zoning administrator being charged with the duty of knowing whether the proposed improvements were properly zoned. Each application that was approved was an affirmative action by the Village of Swansea that resulted in Timothy eventually expending between $1.2 and $1.3 million over 16 years based on his reasonable reliance of the zoning administrator's approval. It is my opinion that a clearer and more compelling case of estoppel could not be apparent. The appellate courts in *FLM Enterprises* and *K-Five Construction* both found that the residents justifiably relied on statements from the zoning agency even when the statements were only oral representations regarding zoned property.

¶ 93 Here, we have oral and written representations indicating that Timothy's proposed improvements were properly zoned repeatedly over 16 years and the majority fails to provide any analysis that distinguishes this case from *FLM Enterprises* or *K-Five Construction*. Further, the

32

majority's contention that a storage building could be placed in the conservation district, but a gas station could not, is disingenuous. See Swansea Zoning Code § 154.070(B) (eff. Mar. 17, 2014). The permitted uses listed within the ordinance do not include gas stations or storage sheds. *Id.* It is my opinion that the Village of Swansea was well aware, based on its own inspections, how the sheds were being utilized and marketed to the public. Indeed, the applications confirmed that each "building" was 112 feet long and the photographs submitted in evidence clearly depict storage buildings with approximately eight garage doors delineating each "unit" contained in the building.

¶ 94     As noted above, the buildings were inspected after they were placed on the property. The majority's attempt to imply that the purpose of the buildings was not apparent to the zoning administrators or that the zoning administrators would not know that the building purpose did not fall within the defined use of buildings permitted in the conservation district is uncompelling.

¶ 95     Notably, the buildings were identified as being in violation of the Village of Swansea "Code" in the March 5, 2010, correspondence from the deputy code administrator, Randall E. Tedesco, that was directed to Timothy. The March 5, 2010, correspondence confirms that the Village of Swansea knew of both the purpose of the buildings and the zoning violation at that time. Follow-up correspondence dated September 15, 2010, from John Openlander, the village and code administrator, again advised of the zoning violation and further advised Timothy of a 10,000-square-foot limit on the storage buildings imposed by the former building and zoning director, Terry Harp. As such, any claim that the Village of Swansea was unaware of the zoning violation has no merit. The Village of Swansea was well aware of the zoning violation, and yet the Village of Swansea continued to issue permits and certificates of compliance that allowed Timothy to substantially expand the commercial use for over a decade thereafter. Accordingly, I find the evidence more than sufficient to find estoppel and that the circuit court's finding of equitable

33

estoppel as to the 1958 Llewellyn Road property was not against the manifest weight of the evidence and the Board's decision as to that same property was clearly erroneous.

¶ 96 Interestingly, the circuit court did not find that estoppel was applicable for the improvements made at the 2012 Llewellyn Road location despite the fact that Timothy continued to expend funds based on approval by the Village of Swansea zoning administrator. Instead, the court found that Timothy "failed to provide the same supporting testimonial evidence" for that later purchased property. While the record was not as voluminous for the 2012 Llewellyn Road property, it is my impression that sufficient evidence to find estoppel was submitted.

¶ 97 The record revealed that Timothy requested the initial permit, as to the 2012 Llewellyn Road property, on March 13, 2020, which was approved on March 15, 2020. After hearing nothing from the village but receiving approval of the building permit at that location, seven months later, Timothy requested a loan from the Bank of Belleville for further improvements on the property. The loan appraisal was performed in October 2016. Thereafter, on January 18, 2021, and again on December 17, 2021, Timothy requested, and received, permits from the zoning administrator, to place additional buildings on the 2012 Llewellyn Road property. While the December 17, 2021, permit stated it was approved by Dallas Alley, Iliff confirmed that as of November 2021, he was the zoning administrator who issued the December 17, 2021, permit as well as the January 3, 2022, application for a permit to demolish a building on those premises. It is equally notable that when Iliff issued a cease and desist order to Timothy related to residential property, the order listed recommendations that would allow the property to remain in the zoned area and it was not until June 9, 2023, that Iliff issued a second cease and desist order, this time related to all the buildings placed on the 1958 and 2012 Llewellyn properties in the 16 years the business was in operation from 2007 to 2023. It also bears noting that a proposed settlement agreement dated June 20, 2023,

34

is also found in the records and was touted by Iliff after his issuance of the second cease and desist order.

¶ 98 Once again, with full approval by the Village of Swansea zoning administrator, Timothy invested further in the 2012 Llewellyn property after requesting, and receiving, a loan from the Bank of Belleville in October 2020, after the initial permit was issued in March 2020. While admittedly, the length of time was not as extensive as that shown for the 1958 Llewellyn property, the Village of Swansea's affirmative actions, Timothy's reliance, and Timothy's prejudice were shown by the evidence submitted for the 2012 Llewellyn Road property. Accordingly, I would find that the doctrine of estoppel applied to both properties and the circuit court's finding as to the 2012 Llewellyn Road property was against the manifest weight of the evidence.

¶ 99 Finally, I also believe the doctrine of *laches* is applicable. " '*Laches* is an equitable defense asserted against a party "who has knowingly slept upon his rights and acquiesced for a great length of time ***." ' " *McCombie v. Illinois State Board of Elections*, 2025 IL 131480, ¶ 4 (quoting *Tillman v. Pritzker*, 2021 IL 126387, ¶ 25, quoting *Pyle v. Ferrell*, 12 Ill. 2d 547, 552 (1958)). "*Laches* has two fundamental elements: (1) lack of due diligence by the party asserting the claim and (2) prejudice to the opposing party." *Id.*

¶ 100 Here, the evidence revealed that the Village of Swansea zoning administrator failed to assert its enforcement of the zoning ordinance for over 16 years and instead continued to issue initial zoning conformance certificates and building permits to Timothy during that period. During that same period, Timothy invested in the property spending between $1.2 and $1.3 million on a business that the Village of Swansea closed after previously allowing the business to expand for 16 years. Once again, while the majority relies on Timothy's lack of knowledge regarding the Village of Swansea zoning requirements, it fails to address the fact that the zoning administrator,

35

who was charged with knowing and enforcing those same zoning ordinances, ignored their own responsibilities to both Timothy and the Village of Swansea.

¶ 101   As stated above, to require the resident to know more about the zoning requirements than the Village of Swansea zoning administrator is contrary to common sense, especially after initial certificates of zoning compliance were issued by the zoning officer charged with administration and enforcement of the zoning code as well as disbursing their knowledge of the zoning ordinances to the public and reviewing applications for certificates of zoning compliance to ensure compliance with the ordinances. See Swansea Zoning Code § 154.202(D)(1), (2). Here, the zoning administrator not only told Timothy that his buildings were compliant, but the zoning administrator issued written documentation in support of the statement and also told members of the general public that the buildings were "grandfathered" and "nothing could be done." Accordingly, I believe Timothy provided sufficient evidence to meet the required elements for the doctrine of *laches.*

¶ 102   For the foregoing reasons, I believe the Board should be directed to issue certificates of nonconformance for both properties, and therefore, I dissent.